**Joseph SWAALEY**

v.

**The UNITED STATES.**

No. 405–65.

United States Court of Claims.
May 12, 1967.

Carl L. Shipley, Washington, D. C., for plaintiff. Shipley, Akerman & Pickett, Washington, D. C., and Samuel Resnicoff, New York City, of counsel.

Manfred J. Schmidt, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This is an action by an honorably discharged veteran to recover the salary which he claims has accrued since his involuntary separation from his position of Heavy Duty Equipment Mechanic, WB–11, at the former New York Naval Shipyard, Brooklyn, New York. The case is before us on cross-motions for summary judgment. There is no material issue of fact. Plaintiff asserts various reasons why his discharge from the shipyard work force was unlawful, but the one we consider dispositive is that he was deprived of his right to "petition the Government for a redress of grievances" under the First Amendment.

The "petition" in question was a letter which plaintiff mailed to the Honorable Fred Korth, Secretary of the Navy, dated February 11, 1963. Plaintiff did not, so far as the record shows, mail or otherwise publish it to anyone else. The letter begins:

> Dear Sir:
>
> Promotions in the Transportation Department (02 Shop) of the Public Works Dept., New York Naval Shipyard, Brooklyn New York are usually made in an unfair and prejudicial manner. The important qualifications are (a) How much will you pay? (b) Who do you know? (c) What favors do you do? (d) What's in it for me? The three shop personnel mostly responsible for these unethical promotional policies in 02 Shop are * * * [three named persons].

The letter goes on to give various specific instances of alleged favoritism and wrongdoing in the Naval Shipyard. Many of these were already known to the local authorities (whether or not to Mr. Korth) but corrective action was only in process, not completed. According to the Shipyard Commander's letter of March 11, 1963, "action has been *or will be* taken" against any individual who had committed criminal or improper actions. Plaintiff also complained that he had passed examinations for promotion and was first on eligible lists, but that others had been promoted over his head. (Emphasis supplied.)

The following statement was of peculiar importance, as will appear:

> During the two lengthy conversations I have had with [X, a high management official] * * *. I tried to impress upon him the unfairness and prejudice of 02 Shop promotions. I indicated to [X] * * * that I am better qualified and better educated than the people who bypassed me * *

[X] finally told me very clearly "you do not get a promotion because you deserve it, you must pay for it. When you are ready, I will let you discuss the terms with * * * [Y]."

Plaintiff concluded the letter with the information that he was a veteran of three campaigns in the Pacific Theater, and that he had received a

Service Connected Disability Award until November 1961, for a Liver Condition I contracted in the Pacific. I have more than twenty years of Government service. I am honest which unfortunately is a big disadvantage in this Shipyard.

The Bureau Chief forwarded the letter to the Shipyard with an endorsement calling for "appropriate action." Then, needless to say, the roof fell in on plaintiff. The record does not reflect whether the Secretary ever saw the letter.

The Shipyard Commander's letter of March 11, to plaintiff, quoted supra, traverses plaintiff in detail as to discrimination in promotion, and says that the vast majority of persons plaintiff named were decent, honest and dedicated. It accuses plaintiff of seeking to make a deal with the Director of Industrial Relations to desist from informant activities in return for a promotion, a charge not pressed thereafter. It also states that Shipyard officials, particularly management employees, need to be protected against "continuing allegations and insinuations by employees." The letter ends by advising plaintiff:

* * * you have ten days from the date of this letter to present corroborative evidence in support of your defaming statements, insinuations and quotes from private conversations.

Also, he was informed he might retract his statements, but with no assurance that the retractions would cancel out "any contemplated disciplinary action."

On March 29, 1963, a letter advised plaintiff that it was contemplated to remove him from employment in the Shipyard for making "unfounded statements" in the letter. No other misconduct was relied upon. Six statements were quoted, the one relating to X and Y being designated Specification 1(f). The letter stated that the statements maligned the Shipyard and its officials, and undermined the character, reputation, and efficiency of high level military and civilian officials, and had an adverse effect on the trust and confidence placed in the Shipyard. And, that writing directly to the Secretary "added to the degree of harm sustained by the Shipyard." Plaintiff, the letter continued, though afforded an opportunity, had neither presented corroborative evidence to support his allegations, nor had he retracted them. Plaintiff could have had a hearing at which he might "produce witnesses who have a direct knowledge of the circumstances and factors bearing on these charges."

The March 11, letter referred plaintiff to "NCPI 750.2–5" (Navy Civilian Personnel Instructions) which established the ground rules applicable to his dismissal. It is entitled:

*Irresponsible Statements Made by Employees*

It says in effect that if an employee in the course of a hearing reflects on the honesty, integrity, motives or efficiency of others, the hearing officer must consider if the statements are sufficiently disparaging and not in thoughtless self-defense or as a mere expression of anger and hostility. If they are, the employee must be advised he will be held responsible. " * * * he should be prepared to substantiate his statements and failure to do so may be a cause of disciplinary action * * *." And he " * * * should be allowed to make a timely retraction of his statements * * *." A second section continues that if the disparaging statements are "in writing, the appropriate officer should discuss the matter with the employee, following the principles stated in (1) above, as applicable." That is, either the employee must prove his derogatory statements, retract them, or be disciplined. The manage-

ment representative stated the ground rules thus at p. 3 of the hearing:

Management has not at any time said these statements are untrue, nor does Management intend to say that these statements are untrue. Management has made the statement that these statements are unfounded merely by the fact that the appellant has not, in the opinion of Management, provided sufficient information to convince us completely that all his statements are true.

The Navy had made little investigation of the charges, except as to 1(f), leaving the plaintiff to his obviously anticipated failure to prove them. This is explainable as some of them were known already and as to others, plaintiff, they thought, had destroyed his credibility with unfounded accusations on prior occasions.

Under date of May 7, 1963, a Hearing Advisory Committee reported to the Commander that the hearing had been held on April 15, 25, and 29. It stated, plaintiff "failed to demonstrate either that his statements are true or that there was a reasonable basis on which an employee might make such statements."

With respect to charge 1(f), Mr. X (called by the Chairman) denied under oath at the hearing that he said anything like what plaintiff had alleged he had said. Some corroboration of this was found in the fact that plaintiff, reporting on prior occasions on the same conversation with Mr. X, did not mention any such words. However, Swaaley took the stand and repeated this charge under oath. He was cross-examined but not asked to explain his inconsistent reports on prior occasions. It was noted that Y, referred to supra, was at the time of the hearing suspended and had been arrested for misconduct, so it would have been difficult to damage further his reputation. The Navy offered no evidence on the other charges but plaintiff did produce some testimony to show they were true or might have been believed to be true.

The plaintiff was discharged as of May 10, 1963, and appealed to the Director, New York Region, Civil Service Commission, who made a detailed analysis of the case and decided to sustain the removal, under date October 31, 1963, affirming all but one of the six specifications. Concerning burden of proof he said the following:

In a case of this type, an employee may not be penalized because of his inability to establish the literal truth of his accusations; however, he does not have an unrestricted privilege in making defamatory remarks about his superiors. The rule is that an employee who honestly believes he has information of misconduct on the part of his superiors may divulge it to higher officials without liability even if it turns out that his information is incorrect so long as he acts in good faith and has reasonable grounds for his belief.

But he found that plaintiff's proofs did not satisfy this standard, as to five of the specifications, including 1(f).

The case then went to the Commission's Board of Appeals and Review, which decided that plaintiff's appeal should be sustained and plaintiff reinstated. This Board noted that many of plaintiff's allegations were essentially true and that the Shipyard had made no investigation except as to Specification 1(f). It noted that a charge of making "unfounded" statements, as here, is sustained when the employee fails on confrontation to "offer substantiation or withdraw his allegations." The Board said that the evidence showed employee misconduct and questionable personnel practices at the Shipyard "which might tend to stimulate such allegations as were expressed in your [i. e., plaintiff's] letter to the Secretary of the Navy." Although the plaintiff's allegations might be considered "irresponsible" or "defamatory", the "agency" had not proved they were "unfounded", that is, "made without any reasons shown which could lead an individual to the expression, in good faith, of such accusations."

The Navy strongly urged a reconsideration, at least with respect to Specification 1(f) respecting X and Y, where it urged the evidence to prove X had made the statement plaintiff had attributed to him was greatly overcome by contrary testimony. It said:

It is submitted that where offenses are laid under a charge of unfounded statements and the burden is on the employee to offer substantiation or to have the charges issued against him, then, too, in the matter of proof where the facts are purely within his own knowledge, the burden is on the employee to substantiate his statements. That is the interpretation placed by this office on NCPI 750.2–5b, and also by the activity. It was for this reason that the activity did not go forward in establishing that the accusations were unsubstantiated.

It went on to argue that the proofs showed plaintiff's accusations under Specification 1(f) were not only "unfounded" but also untrue. And it denied that the factor of good faith entered in, "for Mr. Swaaley's statement was not made in reliance on statements made to him by others, * * * but rather rides or falls on whether the statement attributed to [X] * * * was actually made."

Parenthetically, this would seem to reflect the common fallacy that if two persons have an oral conversation and differ afterwards as to what was said, one or the other must be lying, and if the later statements are under oath, one or the other must be committing perjury.

This final appeal prevailed insofar as the Commission found that Specification 1(f) was sustained, plaintiff's removal was not unreasonable, arbitrary, or capricious, the Board decision was reversed, and the action of the Shipyard in removing plaintiff was sustained.

It is not intended to suggest that plaintiff's act in writing the letter was prudent or admirable, but people who do rash and even contemptible things are often just the ones for whom constitutional safeguards exist. The exasperation on the part of the Shipyard officials against plaintiff is understandable, but they were not justified in acting, as some of their statements indicate, as if plaintiff in writing to the Secretary not to one of them, was practically delivering ammunition to the enemy. The Secretary was responsible for the successful operation of the Shipyard just as much as they were. He could be trusted not to misuse plaintiff's communication just as much as they could. There can be no doubt that, its defamatory trimmings aside, the letter was basically a petition for redress of grievances. Plaintiff at least deserved a plus for signing his letter: most like his are anonymous. The heads of executive departments, and their bureau chiefs, must often use such letters, signed or anonymous, to do their jobs, distasteful though it may be. There is a lot of wickedness in the world and much of it would never be discovered but for information given for spite, revenge, or lust for gain.

As a practical matter, plaintiff may well have supposed that a letter routed to the Secretary through regular channels would never leave New York. There is little in the record to suggest it would have been forwarded. And one who wishes to report misconduct has a hard time doing it without naming names; if he tries his letter may not be sufficiently specific to be given attention. An employee writing a letter such as we have here might be presumed to desire that the Department would cause his charges to be investigated. He would almost never be able to prove anything himself; that is hard enough for trained investigators using sophisticated techniques, and yet solely by rumor and hearsay he may have a pretty good idea where the bodies are buried. Hence, to say an employee reporting what he believes is going on is guilty of misconduct if he cannot prove it, is tantamount to saying he is not to transmit anything at all. Any regulation which would compel the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of dismissal from his job—leads

to "self-censorship," Cf. New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a result which cannot be tolerated in this area.

In view of the foregoing, the harm in suppressing petitions by federal employees to the heads of their departments, could be substantial, even if limited by the employee's easy recourse to anonymity. On the other hand, the evils plaintiff is charged with causing were not due to him at all, or not demonstrably so. The letter had done no harm up to the time it arrived in the Secretary's office. He was entitled to assume it would be dealt with there with prudence; if he had indiscriminately distributed copies the issue presented here would be entirely different, as will appear. If this letter did harm, it was due to the persons who handled it after receipt.

The importance the law attaches to informants appears in several contexts, e. g., the police informant's privilege against the disclosure of his identity in criminal proceedings. McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (March 20, 1967). As the Supreme Court said many years ago,

It is the duty and the right * * * of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States. It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the *posse comitatus* in upholding the laws of his country. It is likewise his right and his duty to communicate to the executive officers any information which he has of the commission of an offence against those laws; and such information, given by a private citizen, is a privileged and confidential communication, for which no action of libel or slander will lie * * *. [In Re Quarles and Butler, Petitioners, 158 U.S. 532, 535, 15 S.Ct. 959, 961, 39 L.Ed. 1080 (1895).]

The court did not predicate this immunity on the First Amendment but on the Government's inherent right of self-preservation. However, this language will hardly be thought inconsistent with the view developed herein, that the need of Department heads for information supports an immunity, under the First Amendment, for petitioning employees who transmit material to them which, if believed, reports the commission of a crime, unless that material is willfully false or included in reckless disregard of it truth or falsity. We think the freedom of the press to criticize and it may be, defame, public officials has no better support than the freedom of petition here involved. We agree with Judge Fahy's suggestion that the doctrine of New York Times Co. v. Sullivan, supra, applies to federal employee's petitions. See Turner v. Kennedy, 118 U.S.App.D.C. 104, 332 F.2d 304, 307 (1964), cert. denied 379 U.S. 901, 85 S.Ct. 189, 13 L.Ed. 2d 175 (dissenting opinion). See also, Dismissals of Public Employees for Petitioning Congress: Administrative Discipline And 5 U.S.C. Section 652(d), 74 Yale L.J. 1156 (1965). Cf. Steck v. Connally, 199 F.Supp. 104 (D.D.C.1961). These suggestions, it is true, relate to petitions to Congress. But, it would seem that whatever rights a civil service employee has under the First Amendment include petitions to the head of his own department as well as those to Congress. Mr. Justice Story, in his Commentaries on the Constitution, Vol. II, Section 1895, at 645, note b (5th ed. 1891), said of the right to petition:

The statements made in petitions addressed to the proper authority, in a matter within its jurisdiction, are so far privileged that the petitioner is not liable, either civilly or criminally, for making them, though they prove to be untrue and injurious, unless he has made them maliciously.

This statement was also quoted with approval in Turner v. Kennedy, supra, 332 F.2d at 307 (dissenting opinion). In Bridges v. State of California, 314 U.S. 252, 277, 62 S.Ct. 190, 86 L.Ed. 192 (1941), a telegram to the Secretary of

Labor was held to be a First Amendment petition.

■ Public employees have First Amendment rights which may not be curtailed arbitrarily or by vague and ill defined rules. Keyishian v. Board of Regents of the University of The State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and cases cited. Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). The rights are not absolute and Congress may limit them as they would otherwise be by clear and reasonable provisions. United Public Workers, etc. v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (Hatch Act). "Appellants urge that federal employees are protected by the Bill of Rights and that Congress may not 'enact a regulation providing that no Republican, Jew, or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.' None would deny such limitations on Congressional power * * *." id. at 100, 67 S.Ct. at 569. No statutes or regulations are cited to us specifically delimiting the form and content of petitions for redress of grievances by federal employees to the heads of their Departments. There seems to be no reason, in the inherent nature of Federal employment, or otherwise, why New York Times Co. v. Sullivan, supra, should not be deemed, in the absence of legislation or regulation, to state the limits a federal employee may go towards defaming supervisory officials in the course of a petition, without loss of First Amendment protection.

■ Therefore, we hold that a petition by a federal employee to one above him in the executive hierarchy is covered by the First Amendment and if it includes defamation of any Federal official, protection is lost only under the circumstances in which a newspaper article would lose such protection if it defamed such official. "Criticism of * * official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes * * * official reputations. If neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate." New York Times Co. v. Sullivan, supra, 376 U.S. at 273, 84 S.Ct. at 722.

■ The right of a Civil Service employee to petition, except to the extent covered by 5 U.S.C. § 652(d) with respect to petitions to Congress, does not extend outside the executive branch and the courts. It should remain in the power of the Heads of Departments to safeguard their employees against irresponsible false accusations by fellow employees, a matter of importance in the periods of hysteria and witch-hunting we are as a nation sometimes guilty of. A petition, properly so-called, that has never left a Department need do no harm. The responsibility, of course, falls on Congress when petitions to it have come into its hands. In either case the remedy is not suppression at the source.

We turn to New York Times Co. v. Sullivan, supra, for the guidelines we are to apply. The opinion written for the court by Mr. Justice Brennan declares, at pp. 279–280, 84 S.Ct. at p. 726: "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Three justices, concurring specially, thought that this standard did not protect the press sufficiently from retribution for its attacks on public officials, and urged an absolute immunity.

The court said at p. 271, 84 S.Ct. at p. 721, "Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker. Cf. Speiser v. Randall,

357 U.S. 513, 525–526, 78 S.Ct. 1332, 2 L.Ed.2d 1460."

A review of the proceedings herein shows that plaintiff lost his job on account of a "defamatory falsehood" (at worst) not shown to have been written with knowledge that it was false or with reckless disregard of whether it was false or not, and moreover, the burden of proving truth as to the crucial statement was thrown on him.

Statements in the charging letters to him and at the opening of the hearing might well have led plaintiff to suppose that to be exonerated, he had to prove the literal truth of every one of the allegations he had made to the Secretary which were relied on in the six specifications. However, a more lenient rule and one more consistent with the Regulation emerged and led the Board of Appeals and Review to dismiss all specifications: this was as the Board put it, the agency had not established by proof that the statements were *unfounded;* that is, that the "statements were made without any reasons shown which could lead an individual to the expression, in good faith, of such accusations." Thus they shifted the burden of proof entirely off the plaintiff and recommended his reinstatement. But the Navy appealed for reconsideration, particularly with respect to Specification 1(f). This, it will be remembered, related to plaintiff's statement to the Secretary that X, a high Shipyard official, told him he would not get a promotion because he deserved it, but that he would have to "pay." It referred to plaintiff's testimony, substantially reasserting what he had said in the letter, and X's unequivocally denying it.

It argued, as quoted supra, that in view of this direct confrontation, the issue of good faith does not enter in, as it might have done with the other specifications. In other words, only when truth or falsity was not directly before the trier of facts was the question of good faith at issue—only when Swaaley knew of what he alleged by hearsay only and could not offer legal proof of its truth or falsity.

There is no reason to doubt that this represented the view of the trier of facts, the Hearing Advisory Committee. That the Civil Service Commission accepted it follows from the fact that it held the Navy action "not unreasonable, arbitrary or capricious" and it reinstated Specification 1(f). Thus it seems clear that Swaaley was convicted on the one specification that apparently stood up, under a view of law that eliminated the issue of his good faith belief in his allegations and required him to prove them true.

As we have indicated, we do not share the idea that if two persons differ in their recollection of a conversation between them, one or the other must be lying. It would have been difficult perhaps for the trier of fact to believe X said what Swaaley stated he had said. X was apparently a sophisticated and responsible person holding a position of trust. Suppose, as there was no reason to suppose, he was corrupt. He would hardly have been so naive as to disclose it baldly to Swaaley, a person he regarded as untrustworthy. Swaaley had reported these conversations before, without mentioning any such statement, though the force of that fact suffers because he was not cross-examined about these prior stories. Persons having knowledge of criminal conduct often disclose it by degrees, not all at once. Swaaley's belief in the truth of his charges derives some substantiation from his sticking to them under oath when obviously it would have been to his pecuniary advantage to retract. Swaaley was convinced that the Shipyard was a sink of iniquity and all its personnel (at least, all the civilians) except himself, corrupt. Such preconceptions on the part of those of limited education color their understanding of what they hear said. Moreover, it will be remembered plaintiff wrote that X said he was to discuss terms with Y, who was already discredited. If he had manufactured the story to injure X, he would have been more likely to say X required payment to himself. All in all, the possibility that Swaaley's statement respecting X was one he believed

was true, even though in fact false, would seem to have enough substance so that exclusion of it from consideration was not harmless error. If Swaaley believed it to be true, he not only might have reported it, but was under a duty to do so. And the trier of fact must have supposed that the burden was on Swaaley to prove that his conversation with X took place just as he claimed.

The proceedings are, therefore, impossible to reconcile with New York Times Co. v. Sullivan, supra.

It is true that a number of cases have been, or can be, cited, of recent enough vintage to post-date the recognition by Courts that Federal employees, in their capacity as such, have constitutional rights, and in most of these employees who circulated defamatory material about their superiors have not fared well. Completeness requires that we distinguish them.

We have already referred to the dissent in Turner v. Kennedy, supra, but the prevailing view, announced per curiam, upheld the dismissal of an FBI employee who was thought to have defamed his superiors in communications to the Congress. Judge Fahy was not certain whether the agency and Civil Service Commission action was in conflict with his views, and would have remanded for reconsideration. The case is not clearly inconsistent with the conclusion we reach herein.

In Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965), plaintiff, a state employee, sued in the Federal court alleging that the State had violated his First Amendment rights made applicable to the State by the Fourteenth. He had already lost in the highest State court. State of Minnesota ex rel. Jenson v. Civil Service Commission of City of Minneapolis, 268 Minn. 536, 130 N.W.2d 143 (1964), cert. denied 380 U.S. 943, 85 S.Ct. 1023, 13 L.Ed.2d 962 (1965). Plaintiff was a welfare case worker and the defamatory material was *in his official reports* of his cases, inserted contrary to official instructions governing the form and content of such reports. These were not petitions, and plaintiff's position challenged the right of welfare officials to prescribe the form and content of reports for their own official use. The Government therein relies on the following statement of the court in Jenson v. Olson, supra, 353 F.2d at p. 828, but we believe the distinctions from the case at bar are obvious:

> * * * plaintiff asserts a right to make any criticism or charges he deems warranted under the protection of the First and Fourteenth Amendments. Within the bounds imposed by the laws of libel and slander no one would deny that plaintiff has this right. Plaintiff, however, has no right to public employment. He may speak as he pleases and level charges at all suspects. But if the exercise of this privilege disrupts his own work and reduces the efficiency of the department he is subject to discharge for cause. The plaintiff has an absolute obligation to satisfactorily perform the duties and work inherent in his position. One of these duties is to conform to departmental regulations in making his investigations and reports. He may speak as he wishes but also must be responsible for his statements. When his speech is disruptive of the proper functioning of the public's business the privilege of governmental employment may be withdrawn without its being said that he was denied his freedom of speech.

The statement about plaintiff having no "right to public employment" echoes the holding of Mr. Justice Holmes when Chief Justice of Massachusetts:

> The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. [McAuliffe v. Mayor, etc., of City of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892).]

But evidently this is the kind of statement that applies when it applies and therefore is of no help to us here. See comment in Garrity v. State of New Jersey, 385 U.S. 493, 499, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

There are three recent cases decided by this court involving separation of federal employees for defamation. The latest, Krennrich v. United States, 169 Ct.Cl. 6, 340 F.2d 653, cert. denied 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109 (1965), involved anonymous letters to superiors, to fellow workers, and one wife of a fellow employee. This court held that the agency need not prove the communications were false. Clearly there was no First Amendment petition involved. We said, at p. 8, 340 F.2d at p. 654:

> Such communications have no place, no sanction, and no privilege in federal employment.

And we referred to the employing agency's Handbook permitting removal as a consequence of " * * * making false, vicious, or malicious statements * *."

In Harrington v. United States, 161 Ct.Cl. 432 (1963), the Air Force had discharged plaintiff, a civilian employee, for *printing and circulating* without a required clearance a pamphlet entitled "How Kelly Field Spends Your Tax Dollars", alleging various kinds of waste and mismanagement. We said at pp. 443–444:

> We emphasize, too, that plaintiff was not discharged because, as a citizen or an employee, he simply sought to call attention through proper channels to maladministration at the Government installation for which he worked. Certainly, employees of the Federal Government are not shut off from discussing the defects of their employer, in proper context and fashion. Cf. Wieman v. Updegraff, 344 U.S. 183, 191–92 [73 S.Ct. 215, 97 L. Ed. 216] (1952). But "How Kelly Field Spends Your Tax Dollars"—the pamphlet on which the removal was based—is not (on the one hand) a temperate, documented, discussion of specific circumstances known to plaintiff which deserved airing, nor is it (on the other hand) mere casual private "griping" of the common garden variety. It is a public printed document, deliberately circulated to about 100 individuals, which (i) makes several serious, but broad, general and unsupported accusations of maladministration against the Air Force and Kelly Field, * * *. By his publication of this unwarranted and defamatory broadside, plaintiff violated the obligation of loyalty each employee owes his employer * * *. The Federal Government, as employer, is entitled to a like measure of loyalty. * * *

There is nothing in the instant plaintiff's behavior under the one specification that still stands, to warrant any similar comment. Our reference to Wieman v. Updegraff, supra, was to emphasize that we did not subscribe to the school of thought that no one has a "Constitutional right to be a policeman" as a consideration always determinative. That case holds that under some circumstances one does have such a right. Cf. Garrity v. State of New Jersey, supra. In our view, plaintiff herein did not by writing the Secretary breach his duty of loyalty as we saw Harrington as having done.

In Houston v. United States, 156 Ct. Cl. 38, 297 F.2d 838, cert. denied 371 U.S. 815, 83 S.Ct. 27, 9 L.Ed.2d 56 (1962), plaintiff made his defamatory statements to an investigator sent to take them, so there was no going outside channels, but no "petition" either. He charged two of his superiors in a field office with dishonesty, incompetence, gullibility, and falsehoods; of one, that he associated with people "communistically inclined;" and that the other failed to report a "sexual pervert." The investigator exonerated these two persons and plaintiff's discharge followed. Our per curiam opinion shows we were given considerable pause by the Civil Service Commission's forthright throwing of the burden on plaintiff to prove his charges were true. No Constitutional issue having been raised, we were unable to say the Commission was arbitrary and capricious or acted contrary to law, even if we would not have done the same. Perhaps the case may best be explained as that, when no Constitutional issue is seen, it does not favor the "efficiency of the Service" to require

three executive officials to work caged together in a field office when one has so gravely maligned the other two. Even so, we swallowed hard. The instant case is distinguished by a Constitutional issue.

In Engelhardt v. United States, 125 Ct. Cl. 603 (1953), one of the causes of dismissal, which we sustained, was "making charges of maladministration which you cannot substantiate" but there were other charges and the case is not a precedent as to when defamation alone is properly a cause for discharge.

The Government cites and quotes from Sweeney v. Schenectady Union Pub. Co., 122 F.2d 288, 291 (2d Cir., 1941), aff'd per curiam 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942), but this was a libel action by a Congressman accused by defendant newspaper of being anti-Semitic. It was affirmed by an evenly divided Supreme Court. Judge Clark, below, dissented on grounds foreshadowing New York Times Co. v. Sullivan, supra, and for Sweeney, supra, to be authority, New York Times Co. v. Sullivan, supra, must have never happened. Other cases the Government cites are not sufficiently germane to be worth mentioning.

The conclusion follows that plaintiff's involuntary separation was not made according to law in that the sole cause of dismissal was a petition to the Secretary of the Navy for redress of grievances, containing a statement defamatory to a public official but not shown to be willfully false or made with reckless disregard of its truth or falsity.

Accordingly, defendant's cross-motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted. Judgment is entered for plaintiff with the amount of recovery reserved for further proceedings pursuant to Rule 47(c).

SKELTON, Judge (concurring):

I concur in the result reached in the opinion of the court delivered by Judge Nichols; however, I would reach that result by a different route.

This is not a libel action for damages as was the case of New York Times Co. v. Sullivan, supra, but is a case where a government employee says he was unlawfully discharged for making derogatory statements about his superiors. The rights and privileges of a newspaper are different to those of a public employee and are founded on distinguishing reasons and bases. A newspaper is free from liability for an untrue defamatory statement about a public official, in the absence of malice, because it enjoys the right of fair comment and criticism; whereas, a public employee is not liable civilly or criminally for making an untrue defamatory statement to a superior about another employee, in the absence of malice, when made in the course of his employment, because such a statement is qualifiedly privileged due to the peculiar relationship of the parties.

Consequently, I do not think we should equate the rights and privileges of newspapers and those of public employees in this field.

I do not think it is necessary to decide this case on the basis of the first amendment of the United States Constitution, although it may not be error to do so. The letter which the plaintiff wrote was in the nature of a complaint to advise his superiors what was going on in his department. In any event, it was privileged since no malice on his part was ever shown.

Under these circumstances, according to the Navy's own rules, which are discussed in the court's opinion, the plaintiff's punishment was too severe, and, therefore, his discharge was illegal. See Daub v. United States, 154 Ct.Cl. 434, 437, 292 F.2d 895, 897 (1961). I do not reach the question of whether the plaintiff's action was wrong or protected by the first amendment to the Constitution.

COLLINS, Judge, joins in the foregoing concurring opinion.