OPINION
Bennett, Chief Commissioner: This suit for back pay by a former civilian Government probationary employee was remanded for trial after this court denied both the plaintiff’s *1075 motion and the Government’s cross-motion for summary judgment. Jackson v. United States, 192 Ct. Cl. 765, 428 F. 2d 844 (1970). The issue to be determined at trial was, as defined by the court, the narrow one of “whether or not plaintiff was discharged as a reprisal for exercising his First Amendment right to petition for redress of grievances.” Accordingly, the factual issue to he determined was whether either the plaintiff’s letter to Levell Johnson or to Harry Miller[1] “by itself or in association with other things” was the reason for the plaintiff’s being discharged from his position as elementary teacher (GS-9) at the Grants, New Mexico Job Corps Center. This determination was to be made after a de novo trial before the commissioner. This case, therefore, differs materially from the usual pay case brought in this court. Plaintiff Jackson bases his right of recovery solely upon a violation of his first amendment right to petition for a redress of grievances and will be entitled to a recovery of back pay upon a showing that the fact of his having petitioned staff members of the Office of Economic Opportunity contributed to his having been discharged. Such a showing has been made and, accordingly, the plaintiff is entitled to a recovery.
The plaintiff was hired by the Grants, New Mexico Job Corps Center on March 13, 1966, as an elementary teacher, grade GS-9. On June 22,1966, the plaintiff received a Three-Month Appraisal Report in which he received four grades of outstanding, ten grades of satisfactory, no grades of unsatisfactory, and which recommended that the plaintiff be retained as an employee. This report was the only evaluation made of the plaintiff’s performance while he was employed at the Center. Not only was there no other evaluation made of the plaintiff’s performance (one was required also after 10 months of employment) but none, of the alleged dis *1076 crepancies in the plaintiff’s performance, which the Government now advances as being the true basis for his discharge, were ever brought to the plaintiff’s attention prior to his discharge.
On September 16, 1966, the plaintiff was selected by Mr. T. L. Figart, Jr., the Center director, to serve as the acting principal teacher. This appointment was precipitated by the illness of Mr. J. L. Corter, the principal teacher, and by the transfer of Mr. Ferrel, who had been appointed acting principal teacher to take Corter’s place. The plaintiff’s relative seniority among the teaching staff at the Job Corps Center weighed heavily in the decision to appoint him acting principal teacher. However, as of the time of his appointment to this position, the plaintiff was considered qualified to discharge the duties of acting principal teacher. Mr. Figart, who was the plaintiff’s immediate supervisor, thought that the plaintiff might possibly be qualified for the permanent position of principal teacher, a GS-11 position. While serving in the capacity of acting principal teacher the plaintiff did not display the degree of initiative expected of a principal teacher and mismanaged the updating of corpsmen’s records. Consequently, on November 17,1966, the plaintiff was reassigned to the position which he had formerly held, that of elementary teacher. After the plaintiff’s reassignment his relations with other staff members deteriorated but his classroom performance remained adequate.
The plaintiff attributed his reassignment to racial discrimination and wrote two letters to staff members of the Office of Economic Opportunity which expressed his strong feelings in this regard. One letter was sent to Mr. Harry Miller in Washington, D.C., and the other was sent to Mr. Levell Johnson in Austin, Texas. The letter to Mr. Miller expressed the additional belief that “saving of this Center depends upon getting rid of this Center Director [Mr. Figart], Field Supervisor and some other [sic] here to make the Center run like [sic] it should.” Absent satisfactory response to his complaints, plaintiff also threatened “to blow the lid off the whole Region” by widespread complaints all the way up to the President.
*1077 On February 21,1967, Mr. Figart called the plaintiff into his office and informed him of his impending discharge which would be effective March 10,1967. When the plaintiff asked for the reasons underlying Mr. Figart’s decision to recommend his discharge, the plaintiff was told only that the letter to Mr. Miller would “haunt” him. Figart regarded the letter as a form of blackmail to secure the job as principal teacher through threats. He testified such behavior would not be condoned. By February 21,1967, Mr. Figart was aware of the existence and the content of both the letter to Mr. Miller and the one to Mr. Johnson. The testimony of Mr. Figart and that of the plaintiff were in agreement insofar as Figart’s telling the plaintiff that he would be haunted by one of the letters which had been sent to OEO and that Figart regarded this as ■a form of blackmail. However, the testimony of the plaintiff indicated that it was the Miller letter to which Figart referred whereas Figart’s testimony was that it was the Johnson letter to which he referred. Judging from the content of the two letters it appears that Mr. Figart would have been more likely to have been offended by the Miller letter than the Johnson letter insofar as it was the former letter which recommended that the Center director be replaced as a prerequisite to the proper functioning of the Grants Job Corps Center. Moreover, Mr. Figart’s recollection of the discussion which he had with the plaintiff on February 21, 1967, was hazy at best, whereas the plaintiff’s recollection with respect to the events of that day was somewhat more substantial. Therefore, the preponderance of the credible evidence indicates that it was the Miller letter which the Center director regarded as being blackmail and which would haunt the plaintiff. It should be noted that this finding is made solely for the purpose of clarity, and insofar as the outcome of this case is concerned, it makes no difference which letter was a cause of the plaintiff’s being discharged since the same constitutional right is jeopardized in either case.
At trial there was testimony elicited by both the plaintiff and the Government which bears on the issue of when Mi*. Figart made the decision to recommend the plaintiff’s discharge. The Government’s theory in this regard was that if *1078 it could be shown that the decision was made before Mr. Figart became aware of the existence of either letter or before either one of the letters had been written, then it would necessarily follow that the letters in no way influenced Mr. Figart’s decision. Moreover, since Mr. Bay who was the personnel director of the Southwestern Begion of the Forest Service and who actually possessed the authority, not possessed by Mr. Figart, to terminate the plaintiff’s employment, had no knowledge of the letters, the demonstrated impact of the letters on the final decision would be substantially reduced or eliminated entirely. The only conclusive evidence with respect to when Mr. Figart finally decided to recommend the plaintiff’s discharge was the memorandum which he wrote making that recommendation to the Forest supervisor, dated February 21,1967, and the discussion which he had with the plaintiff on that same day. The testimony elicited from Mr. Figart by the defendant at trial to the effect that the decision had been made in early January 1967 is not credible in light of a prior contradictory statement made by the witness that his decision was reached in late January and discussed with employees of the personnel office around February 1, 1967. There is no corroboration in evidence of these dates. Moreover, the witness’ inability to recall other related statements and events which transpired at approximately the same time and at the discharge interview lends credence to the position that a determination of when the decision was actually made cannot be based on the witness’ after-the-fact speculation concerning his state of mind 4 years ago. Therefore, what factors influenced Mr. Figart’s decision to recommend the plaintiff’s discharge must fairly be viewed from the standpoint of February 21,1967, and what he said and did on that day. The memorandum he wrote on that day recommending plaintiff’s discharge contains no reference to the Miller-Johnson letters but, as shown in the findings, details many alleged failures in plaintiff’s performance of duty and in his attitude. It is not necessary to discuss them here for Mr. Figart did not discuss them with plaintiff at any time, and the truth of his allegations is not in issue although defendant argues that *1079 plaintiff’s discharge was eventually based largely thereon, to the exclusion of the Miller-Johnson letters.
Mr. Figart transmitted his recommendation recommending the plaintiff’s discharge to Mr. Murray, the Forest supervisor, and Mr. Murray transmitted both his own concurring recommendation and that of Mr. Figart through proper channels, both of them ultimately reaching the office of the personnel director of the Southwestern Region of the Forest Service. Mr. Milton Ray had become the regional personnel officer on January 31,1967, and it was he who possessed the authority to discharge the plaintiff. Shortly after Mr. Ray assumed the position of personnel director he was informed by Miss Kallimani, who had been acting personnel officer, of the possibility of the forthcoming discharge of plaintiff from the Job Corps Center at Grants. Since he had just recently become personnel director, Mr. Ray told Miss Kallimani to complete the staff work with respect to the plaintiff’s possible termination and that when she arrived at the point of being able to make a recommendation he would discuss the matter with her. Miss Kallimani prepared a letter for Mr. Ray’s signature terminating the plaintiff’s employment. Mr. Ray signed and transmitted this letter to the plaintiff via the Forest supervisor. At the time she drafted the letter Miss Kallimani was aware of the letters which the plaintiff had sent to Miller and Johnson. Mr. Ray, on the other hand, was not aware of the existence of either of the letters when he signed the termination letter given him by Miss Kallimani and relied exclusively on the memoranda which had been sent to him by Figart and Murray. There was no independent determination by Mr. Ray of the factual basis underlying Mr. Figart’s allegations concerning the plaintiff.
In a consideration of whether, and to whát extent, the Miller and Johnson letters were the cause for plaintiff’s discharge, the following facts are conspicuous: (1) the only evaluation which the plaintiff received while employed at the Job Corps Center was the Three-Month Appraisal Report. In this report it was recommended that the plaintiff be retained as an employee of the Job Corps Center and the plaintiff received four grades of outstanding, ten *1080 grades of satisfactory, and no grades of unsatisfactox-y; (2) as of September 16,1966, the plaintiff was considered potentially qualified for the position of principal teacber (GrS-11) and was appointed acting principal teacher; (3) much of plaintiff’s alleged misconduct took place before these expressions of confidence and approval; (4) none of the alleged discrepancies in the plaintiff’s performance which appear in the termination letter from Mr. Ray were ever mentioned to the plaintiff nor was the plaintiff told at any time prior to February 21, 1967, when Mr. Figart informed the plaintiff of his impending discharge, that his performance was such that his employment as elementary teacher (GS-9) was in jeopardy; (5) in the termination interview, on February 21,1967, which the plaintiff had with the Center director, Mr. Figart, the only reason the plaintiff was given for his discharge was the letter to Miller which Figart regarded as a form of blackmail; (6) the plaintiff had written the letters to Miller and Johnson of the Office of Economic Opportunity on January 8 and January 29, 1967, respectively; the first indication that was given the plaintiff that he was going to be discharged was on February 21,1967; and (7) Mr. Miltozx Ray, who had the authority to terminate the plaintiff’s employment relied totally on the memoranda of Mr. Murray and Mr. Figart and made no independent investigation into the facts alleged in Mr. Figart’s memorandum, Mr. Murray’s being largely conclusory; the termination letter was signed by Mr. Ray and prepared by Miss Kallimani, who knew of the letters which the plaintiff had sent to OEO.
The letters which the plaintiff sent to Mr. Miller and Mr. Johnson of OEO were a basic reason, if not the sole reason, for the plaintiff’s having been discharged. Credibly, it is just not possible to maintain that Figart’s reprimand of plaintiff about such a letter and his characterization of the same as an attempt at blackmail did not enter into his simultaneous decision to effect plaintiff’s discharge, especially when he mentioned no other grounds of discharge to plaintiff. The fact that Figart made no reference to the Miller-Johnson letters in his February 21,1967, memorandum recommending plaintiff’s discharge can be discounted in view of his admissions *1081 at the trial concerning the discharge interview. What he said then is found, in a consideration of the whole record, to have explained what triggered plaintiff’s discharge. Mr. Ray’s having been unaware of the existence of the letters when he signed the termination letter drafted for him by Miss Kallimani does not detract from this conclusion. Miss Kallimani was aware of the letters, as was the plaintiff’s immediate supervisor, Mr. Figart, whose recommendations with regard to the plaintiff’s discharge would naturally carry great weight. In fact, Mr. Figart’s memorandum was given great weight by Mr. Ray when he decided to ratify what at this time had almost become a fait accompli, the signature of Mr. Ray being all that was needed at this juncture to discharge the plaintiff.
There is no need to speculate on what the result in this case would have been if there had been some reliable, verifiable indication during plaintiff’s employment at the Job Corps Center that those in authority considered the plaintiff unsuitable for employment as an elementary teacher (GS-9). Here there was no such indication. After-the-fact rumination and description of plaintiff as an insubordinate, belligerent troublemaker with violent temper and attitudes and actions that can only be characterized as racist, cannot compensate for this deficiency in the record, in light of the first amendment right at stake.
Accordingly, this case comes within the doctrine which this court espoused in Swaaley v. United States, 180 Ct. Cl. 1, 376 F. 2d 857 (1967). In that case the court said:
Public employees have First Amendment rights which may not be curtailed arbitrarily or by vague and ill defined rules. [Citations omitted.] The rights are not absolute and Congress may limit them as they would otherwise be by clear and reasonable provisions. [Citations omitted.] * * * No statutes or regulations are cited to us specifically delimiting the form and content of petitions for redress of grievances by federal employees to the heads of their Departments. There seems to be no reason, in the inherent nature of Federal employment, or otherwise, why New York Times v. Sullivan, supra, should not be deemed, in the absence of legislation or regulation, to state the limits a federal employee may go towards defaming supervisory officials in the *1082 course of a petition, without loss of First Amendment protection. [180 Ct. Cl. at 11 — 12, 876 F. 2d at 863.]
Here, similarly, there has been no reference to any applicable statute or regulation limiting the right of the plaintiff to petition for a redress of grievances. “Probationers * * * as well as ‘permanent’ employees, are entitled to their rights under the Constitution.” Murray v. Jamison, 40 U.S.L.W. 2343 (W.D.N.C. Dec. 2, 1971). Moreover, there has been no contention by the Government and no showing that the letters to CEO were written by the plaintiff with knowledge that the matter contained therein was false or with reckless disregard of whether it was false or not. Consequently, it having been found that the letters which the plaintiff sent to OEO were the basic reason for the plaintiff’s being discharged, the Swaaley doctrine is applicable and governs the outcome of this case. Therefore, the plaintiff is entitled to recover back pay in an amount to be determined in further proceedings in accordance with Rule 131 (c).
FINDINGS or Fact
1. Plaintiff, a college graduate, is a resident of Houston, Texas, where he is a fourth grade science teacher. He was hired by the Grants, New Mexico Job Corps Center on March 13,1966, as an elementary teacher (GS-9). The plaintiff was discharged, effective March 10, 1967, after receiving notification of his discharge on February 21,1967, from Mr. T. L. Figart, Jr., who was the Center director during plaintiff’s period of employment with the Job Corps Center.
2. On June 22,1966, the plaintiff received a Three-Month Appraisal Report signed by J. L. Corter, Sr., work supervisor, and T. L. Figart, Jr., Job Corps Center director, who signed as acting Forest supervisor or division chief. In this report the plaintiff received four grades of outstanding (quantity of work, initiative, technical knowledge and ability, and willingness to assume responsibility) and 10 grades of satisfactory (quality of work, judgment, rate of improvement, ability to get along with co-workers, conduct, willingness to accept supervision, writing ability, speaking ability, general work attitude (including safety), and general work *1083 habits (including safety) ). No grades of unsatisfactory were received. This report recommended that the plaintiff be retained as an employee and was the only formal evaluation made of the plaintiff prior to the recommendation to terminate his employment. A report was supposed to have been made on plaintiff’s performance after 10 months of employment but it was never made although plaintiff requested it. It was Mr. Figart’s testimony that it was about this time, January 1967, that he decided plaintiff’s employment should be terminated.
3. At no time prior to February 21,1967, was the plaintiff disciplined or reprimanded by his superiors at the Job Corps Center; moreover, prior to this time the plaintiff was never told that his performance was such that he would not be retained as an elementary teacher (GS-9). There had been staff discussion of plaintiff’s status 'and performance but the Negro counselor at the Center offered to work with plaintiff on his problems and no other action was taken with respect thereto.
4. On September 16, 1966, the plaintiff was selected by Mr. Figart to serve as acting principal teacher. Mr. Corter, the principal teacher, had become ill and Mr. Ferrel, who had been appointed acting principal teacher to take Corter’s place, was transferred to another Job Corps Center. The plaintiff was appointed to the position of acting principal teacher, primarily because he was the senior teacher; however, the plaintiff was, at the time of the appointment, considered by Figart as barely adequate to discharge the duties of acting principal teacher, although it was thought that there was a possibility that the plaintiff was qualified for the permanent position of principal teacher (GS-11), depending upon his performance. In July 1966, however, the Eegional Forester, upon review of plaintiff’s file, had reported to the Forest supervisor that plaintiff was “very well qualified for filling the position of Principal Teacher, GS-11, and also Corpsman Supervisor in grade GS-11.” It was stated that he was also qualified for corpsman supervisor and education officer (GS-12). Certification of higher authority, however would be required for such appointments. Plaintiff never received such certification.
*1084 5. On November 17, 1966, the plaintiff was reassigned without explanation from the position of acting principal teacher to that of elementary teacher. While acting principal teacher, the plaintiff did not display the degree of initiative expected of one who is principal teacher, a OS — 11 position, and the plaintiff, while acting in this capacity, mismanaged the updating of corpsmen’s records.
6. After the plaintiff’s reassignment to the position of elementary teacher, his relations with other staff members deteriorated whereas his classroom performance remained roughly the same which in the opinion of the Job Corps Center director was “only adequate.”
7. The plaintiff wrote a letter to Mr. Harry Miller of the Office of Economic Opportunity in Washington, D.C., dated January 8, 1967, and a letter to Mr. Levell Johnson of the Office of Economic Opportunity in Austin, Texas, dated January 29, 1967. In both of these letters the plaintiff protested his removal from the position of acting principal teacher and indicated that the Job Center at Grants, New Mexico, was being run in a racially discriminatory fashion. Moreover, the letter to Miller said that “saving of this Center depends upon getting rid of this Center Director, Field Supervisor and some other [sic] here to make the Center run like [sic! it should.” Plaintiff also threatened that if action favorable to him was not forthcoming he would take his story to the newspapers and would file complaints with the Civil Service Commissioner, Director of the OEO, American Legion, Governor of Texas, senators and representatives from Texas, civil rights organizations and the President of the United States, among others. He wrote Mr. Johnson, “I am ready to blow the lid off the whole Region.”
8. The letter which the plaintiff sent to Mr. Miller was acknowledged by a letter from Miller dated January 25,1967. No reply was received from Mr. Levell Johnson.
9. Mr. Figart did not have the authority to terminate plaintiff’s employment. However, as Center director and the plaintiff’s immediate supervisor, Mr. Figart was in an extremely influential position with regard to making a recommendation relating to the discharge or retention of the plaintiff.
*1085 10. On February 21, 1967, Mr. Figart prepared a memorandum for tbe Forest supervisor recommending that plaintiff be discharged. This recommendation as written purported to be based primarily on plaintiff’s alleged views toward race relationships and educational qualifications for certain jobs at the Center. It was alleged that plaintiff considered color instead of qualifications as the proper basis for various positions; that he ignored non-Negro corpsmen and refused to help them in class; that he wished to call in outside help to close down a cafe where he thought corpsmen had been discriminated against; that he had a violent temper and denounced a staff member without cause or investigation; that he refused to accept responsibility and to enforce'Center rules and discipline on the corpsmen; that he was argumentative and belligerent; that he considered any adverse action toward Negro corpsmen as racial discrimination; that he called an unauthorized meeting of corpsmen at which he made critical, unwarranted statements and contended the Labor Department instead of the Forest Service should run the Job Corps; that, in his expressed opinion, Center leaders lacked proper training; that he used unauthorized teaching procedures that ran corpsmen through courses without really learning; that he confused records; that he did not prepare course outlines; that he created discontent among corpsmen, weakened discipline, caused deterioration of staff relationships; and that his job performance was “only adequate.” Mr. Figart stated:
In view of his performance and his detrimental effect on the Job Corps program, I believe that Mr. Jackson is not a suitable employee and that it is in the best interest of the Government that he be terminated as soon as possible.
11. On February 21, 1967, and without advance warning, Mr. Figart called the plaintiff into his office and told him that he was going to be discharged, effective March 10,1967. Confirmation of this action and date was received by the plaintiff on March 13,1967.
12. On February 21,1967, the date of the memo which Mr. Figart prepared recommending plaintiff’s termination and the date on which Figart told the plaintiff that he was going to be discharged, Mr. Figart was aware of the. contents of *1086 both the letter to Mr. Johnson and the one to Mr. Miller and either the originals or copies of these letters were in Figart’s possession at this time. When Mr. Figart called the plaintiff into his office to inform him of his impending discharge he told the plaintiff that the letter to Mr. Miller would “haunt” the plaintiff and that he regarded this letter as a form of blackmail. None of the grounds alleged as a basis for Figart’s recommendation in his memorandum of February 21, 1967, were discussed with the plaintiff at this time or at any other time. However, Mr. Figart denies that any letter plaintiff may have written was a consideration in deciding to fire him.
13. On February 23,1967, Mr. Corter, the former principal teacher at the Job Center, complied with Figart’s request of undetermined date to submit a memorandum relating to the plaintiff’s performance at the Job Center. During the 2 months that plaintiff was acting as principal teacher, Mr. Corter had only 3 days in which to observe his performance in that position due to Corter’s illness and absence which eventually resulted in his retirement. Corter’s observations and criticism of plaintiff concerned his performance as an elementary teacher and relations with the staff and corpsmen while Corter was principal teacher. On the basis of incidents recounted by Mr. Corter, plaintiff was described as a person who dealt in personalities, was belligerent, insubordinate, and a troublemaker with a violent temper.
14. Mr. Figart’s recommendation that the plaintiff be discharged was sent to Mr. I. P. Murray, the Forest supervisor, and Mr. Murray forwarded Figart’s recommendation, along with his own, through the proper channels, both recommendations ultimately reaching the office of the regional personnel officer, Southwestern Region of the Forest Service, U. S. Department of Agriculture. Mr. Murray concurred in the recommendation of Mr. Figart that the plaintiff be discharged and in a memorandum dated February 24,1967, stated, in part:
Mr. Jackson has been employed at the Grants Center since March 13, 1966, and during this period he has never functioned as a team member on the Grants staff. He has constantly created problems between corpsmen *1087 and staff members. Mr. Jackson lias caused any amount of dissension between staff members and has demonstrated that be has no loyalty to Mr. Figart, Center Director.
We feel we have enough problems built in, without Jackson deliberately creating more. Therefore, I concur with Mr. Figart’s memo and recommend that Mr. Jackson be terminated prior to March 13, 1967.
15. On January 31, 1967, Mr. Milton D. Eay became the regional personnel officer, Southwestern Eegion of the Forest Service, U. S. Department of Agriculture, and continued in that position at all times pertinent to this case. Mr. Eay possessed the authority to terminate the plaintiff’s employment with the Job Center. Shortly after Mr. Eay assumed the position of personnel director, Miss Helen Kallimani, who had been acting regional personnel officer, told him that there was a situation involving the possible termination of the plaintiff. Mr. Eay told Miss Kallimani that since he had just recently become personnel officer she should complete the staff work with respect to the plaintiff’s possible termination and when she had arrived at the point of being-able to make a recommendation he would discuss it with her. Subsequently, Mr. Eay received the reports from Mr. Figart and from Mr. Murray recommending that the plaintiff be discharged, and on February 27,1967, Miss Kallimani presented Mr. Eay with a letter which she had prepared for his signature which would terminate the plaintiff’s employment with the Job Center. Mr. Eay then signed the letter and transmitted it to the plaintiff through the Forest supervisor.
16. Miss Kallimani who drafted the termination letter for Mr. Eay was aware of the letters which the plaintiff had sent to Miller and Johnson at the time she drafted the letter for Mr. Eay.
■ 17. In deciding to sign and transmit the letter which had been prepared for his signature by Miss Kallimani, Mr. Kay relied solely on the reports which had been sent to him by Figart and Murray. At the time Mr. Eay signed the letter terminating the plaintiff’s employment he was not aware of either the existence or the content of the letters which had *1088 been sent by the plaintiff to Mr. Harry Miller and Mr. Levell Johnson.
18. Mr. Ray did not make an independent determination of the facts underlying Mr. Figarfc’s recommendation that the plaintiff be discharged. He considered that the probationary period is part of the examining process to establish qualifications of an employee and that, on the basis of information furnished to him, plaintiff had not established his qualifications satisfactorily. Mr. Ray’s letter to plaintiff stated, in part:
We have a report which discloses that the manner of your performance as instructor at the Grants Job Corps Conservation Center has not met the required standards.
Specifically, the report indicates that you lack ability to establish harmonious working relationships with subordinates and other staff members of the Center. Inherent in this failure is your inability to work as a team member, to adhere to policies and procedures, and to execute assignments as agreed to with the Center Director and other key personnel. The effect of your negative attitude has been to create discontent among Corpsmen, to undermine discipline and the confidence of Corpsmen in the staff as well as in the Forest Service, to jeopardize good staff relationships, and, in the overall, to interfere with the objectives of the Job Corps program.
In view of the foregoing, I find it in the best interests of the Job Corps Program and of the Federal Government to terminate your services effective March 10,1967. Friday, March 10, 1967 will be your last day of active duty.
RECOMMENDED CONCLUSION OE LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery is reserved for further proceedings under Rule 131 (c).
After the filing of the stipulation of settlement, the court issued the following order and entered judgment on March 13, 1972:
*1089 ORDER
Following the filing of findings, an opinion, and recommended conclusions of law by Chief Commissioner Marion T. Bennett, this case comes before the court on a stipulation of the parties filed March 6, 1972, signed on behalf of the plaintiff and the defendant by the respective attorneys of record, in which it is stated that a written offer was submitted by the plaintiff to the Attorney General and duly accepted on behalf of the defendant, whereby plaintiff agreed to accept the sum of $12,600 in full settlement of all claims set forth in the petition, and the defendant consented to the entry of judgment in that amount.
IT IS THEREFORE ORDERED that judgment be and the same is entered for the plaintiff in the sum of twelve thousand six hundred dollars ($12,600).
BY THE COURT
(Sgd) WlLSON CoWEN
Chief Judge

 Although the court In remanding this case to the trial commissioner said that it was to be determined de novo whether “the reason for plaintiff's firing was his letter to Mr. Miller, either by itself or in association with other things * * the court also indicated in its opinion that there were two Swaaley-typos letters [Swaaley v. United States, 180 Ct. Cl. 1, 376 F. 2d 857 (1967)] involved in this case. Consequently, the plaintiff’s being discharged must be considered in light of both of these letters and if either letter provided a reason for his being fired the plaintiff will prevail.