$$\psi = \psi_1 + \psi_d + 2\omega t_p \quad \text{or}$$
$$\psi_1 = \psi - 2\omega t_p - \psi_d$$

Robert J. BROUSSEAU

v.

The UNITED STATES.

No. 41–79.

United States Court of Claims.

Jan. 14, 1981.

Daphne Throne, Boulder, Colo., for plaintiff. Mellinger & Throne, Boulder, Colo., of counsel.

Robert E. Richardson, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant. Richard J. Webber, Washington, D.C., and Beatrice Valdez, of counsel.

Before SKELTON, Senior Judge, and NICHOLS and SMITH, Judges.

SMITH, Judge:

This civilian pay case, on which we have heard oral argument, is before the court on the parties' cross-motions for summary judgment.[1] The motions require us to review a decision of the Federal Employee Appeals Authority (FEAA) sustaining Robert Brousseau's demotion from his former GS–15 position as chief of the management and budget division (M&B) of the region VIII office of the Community Services Administration (CSA), to his current GS–13 position of senior community resource specialist. Plaintiff's demotion was effected pursuant to an adverse action proceeding initiated against him by the director of the CSA region VIII office. The two charges which the director lodged against plaintiff

---

1. Plaintiff requests "in the alternative that he be permitted to proceed de novo before this Court."

to commence the proceeding were conflict of interest or position and insubordination. The CSA deciding official sustained both charges; his decision in this regard was upheld by the FEAA.

Before this court, plaintiff asserts that the decision of the FEAA sustaining his demotion is in contravention of his first amendment freedoms of speech, petition, and association. Additionally, he argues that the decision is arbitrary and capricious, is in contravention of Exec. Order No. 11491,[2] and is not supported by substantial evidence. We limit our review of the FEAA decision to a determination whether its having sustained the charge of conflict of interest or position can withstand plaintiff's attacks.[3] We neither reach nor decide the question whether the FEAA's decision to sustain the charge of insubordination is proper.[4]

After careful consideration of the administrative record and of the parties' arguments, we hold that the FEAA's having sustained the charge of conflict of interest or position (i) is not violative of the first amendment, (ii) is not in contravention of Exec. Order No. 11491, (iii) is neither arbitrary nor capricious, and (iv) is supported by substantial evidence. We are satisfied that, had the charge of conflict of interest or position been the only one made and sustained by the CSA, "the same sanction [of demotion] would have been justified, and would have been imposed and upheld on the record made with respect to" this charge.[5] Therefore, we grant defendant's motion for summary judgment.

**2.** 3 C.F.R. 861 (1966–1970 Compilation), *reprinted in* 5 U.S.C. § 7101 note, at 258 (Supp. III 1979).

**3.** *Pascal v. United States*, 211 Ct.Cl. 183, 543 F.2d 1284 (1976) (consideration by court of only two of four charges sustained by Civil Service Commission); *Greenway v. United States*, 175 Ct.Cl. 350, *cert. denied*, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966) (nullification by court of one of four charges on which removal was based).

**4.** In light of *Swaaley v. United States*, 180 Ct.Cl. 1, 376 F.2d 857 (1967), a resolution of

I.

A. (1) In 1977, the headquarters office of the CSA, located in Washington, D.C., was studying reorganization possibilities for its regional offices. By memorandum dated September 23, 1977, a draft of a reorganization plan formulated by management officials in the headquarters office was sent to the regional offices along with a request that each regional director solicit comments on the plan from his staff. The comments were to be presented at a regional directors' meeting in the headquarters office on September 29, 1977.

Upon receipt of the headquarters plan, David E. Vanderburgh, regional director for the region VIII office, issued a memorandum to all region VIII employees wherein he indicated that he was asking region VIII division chiefs to "convene their employees * * * with a view to summarizing [employee] input [on the headquarters plan] for [Vanderburgh] to convey to Headquarters on September 29, 1977." Vanderburgh also stated in his memorandum that he would "be glad to discuss the [headquarters plan] individually with any employee as time permits." By memorandum dated September 28, 1977, Vanderburgh submitted to CSA headquarters his summary of employee input.

The headquarters plan read in part as follows:

### III. GUIDELINES FOR ORGANIZATION

This section outlines the functions which must be performed in all Regional Offices. Except where otherwise noted,

this question would appear to entail a delicate constitutional adjudication. Because such an adjudication is not necessary to the disposition of this case and because federal courts should engage in constitutional adjudication only where it is necessary to the disposition of a case, we decline to address the portion of the FEAA's decision which sustained the charge of insubordination. *See generally United States v. Clark*, 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980).

**5.** *Pascal v. United States, supra* note 3, 211 Ct.Cl. at 192 n.11, 543 F.2d at 1290 n.11.

latitude will be permitted in Regional Offices' organization response to these functional requirements.

For the purpose of clarity, these functions are broken into areas generally associated with organizational location. This division is also reflected in the RO modular structure diagram * * *. *While these decisions are not binding upon Regional Offices, they do provide a standard base upon which all organizational plans should be based. Variations from this base, if justified by regional needs, will be approved on an office-by-office basis.* [Emphasis in original.]

At the September 29, 1977, regional directors' meeting and during the following October, Vanderburgh sought, with regard to reorganization of the region VIII office, approval by CSA headquarters of certain "[v]ariations from" the "RO [regional office] modular structure diagram" which was contained in the headquarters plan. The modified reorganization plan for region VIII proposed by Vanderburgh would have eliminated the management and budget division of the region VIII office without creating a successor division with similar functions. Vanderburgh discussed his modified reorganization plan with both the general and senior staff of the region VIII office.

One of the members of that senior staff was plaintiff Robert Brousseau, who was at the time GS–15 chief of M&B. Brousseau opposed Vanderburgh's modified reorganization plan. On November 3, 1977, Brousseau prepared and circulated among most of the employees of the region VIII office a petition which read as follows: [6]

I hereby support the position that the MB Division, Region VIII, should not be eliminated in reorganization but for the sake of standardization; accomplishment of the mission and career protection should be preserved by a successor Division similar to the Effectiveness Guidance Divisions in Regions VI, XI, X and other Regions.

Brousseau was able to obtain numerous signatures on the petition. On November 4, 1977, without having given a copy of the signed petition to Vanderburgh, Brousseau forwarded the signed petition to three high-ranking CSA management officials in the headquarters office.

(2) In the meantime, a modified version of the headquarters plan was issued to the regional offices on October 18, 1977. This modified headquarters plan (sometimes referred to as the "Gabusi management proposal") was applicable to all regional offices. It contained a detailing provision which would grant to regional directors substantial authority over the reassignment of CSA employees whose positions would be eliminated pursuant to the proposed reorganization.

On November 4, 1977, a special meeting of the local union for CSA region VIII employees (local 3150 of the American Federation of Government Employees) was called. According to the minutes of that meeting,[7] it was called to "INSTRUCT THE PRESIDENT [of the local] ON UNION LOCAL 3150 POSITION [with respect to the proposed reorganization] TO TAKE TO WASHINGTON FOR NATIONAL NEGOTIATIONS." Brousseau, who was at the time a member of local 3150, was present at the meeting. During the meeting, he indicated that he was opposed to Vanderburgh's modified reorganization plan for region VIII and to the detailing provision contained in the headquarters modified plan. According to the minutes of the meeting, a "[m]otion was made by Robert Brousseau: This Local rejects the Gabusi Management Proposal in its entirety [sic] due to the 'detail' provisions. Seconded by Harold MacDonald, Passed Unanimously." Also according to the minutes, a

[m]otion was made by Dennis Walker: This Local objects to the elimination of the Management and Budget Division in

---

**6.** Brousseau admits in an affidavit which is in the administrative record that he "sought [the petition] from general staff" and that he "took the petition."

**7.** The minutes were prepared by the then "Secretary Pro Temp" of local 3150.

Region VIII's Proposed Reorganization without their being a successor division such as the effectiveness and guidance divisions as are proposed in other regions. Seconded by Eunice Sowell. Passed Unanimously.

B. On December 15, 1977, Vanderburgh issued a notice of proposed adverse action to Brousseau. The adverse action proposed was removal of Brousseau from his position as chief of the management and budget division of the region VIII office and from the federal civil service. The notice set forth two reasons for the proposed adverse action: conflict of position or interest and insubordination. As we indicated earlier, we consider only the charge of conflict of position or interest.[8]

The notice set forth two specifications in support of this charge. The charge and the two specifications read as follows:

1. *Your actions in regard to your unauthorized dealings with the union in this region and your active participation in the preparation and circulation of a petition opposing management's plans for reorganization constitute a conflict of position and/or a conflict of interest.* [Emphasis in original.]

a. *Your unauthorized dealings with the union in this region have substantially undermined labor-management relations in the regional office.* According to the minutes of the meeting of Local 3150, AFGE (AFL–CIO), on November 4, 1977, you attended the meeting and made a motion without authority rejecting the position of Headquarters management (John Ga-

busi) "in its entirety." As Chief, Management and Budget Division, a member of management, and in light of the current reorganization process taking place in this Agency and the delicate nature of the negotiations taking place between the Union and management in reaching a mutually agreeable management proposal, your actions were inconsistent with the official position taken by management. [Emphasis in original.]

These actions had the effect of undermining labor-management relations. In addition, it exposes this Agency to an Unfair Labor Practice charge under Executive Order 11491, as amended February 6, 1975, which forbids management from interfering in, coercing, or participating in union business. This provision and its implications were well known to you, through continued discussion over the years, as well as reiteration at a recent senior staff meeting in my presence. It is also in violation of the obligation of a management employee outside the bargaining unit, to support an announced and clear position properly taken by superior management in its dealing with organized labor in the bargaining unit. Instead of lending support, you wrongfully participated in the union meeting and influenced other employees to take a position in opposition.

b. *Your active participation in the preparation and circulation of a petition protesting a feature of my reorga-*

---

8. Although we do not consider the charge of insubordination, we state the facts underlying it. The petition which Brousseau forwarded to three high-ranking CSA management officials in the headquarters office was attached to a letter which Brousseau had written and which he had addressed to the three officials. The letter was critical of the detailing provision in the headquarters modified plan and of Vanderburgh's proposal to eliminate the management and budget division of the region VIII office. On Friday, November 4, 1977, Brousseau forwarded the letter and petition to headquarters by enclosing them in a sealed envelope and by giving the sealed envelope to a CSA employee

(not Vanderburgh) who was returning to Washington for labor/management negotiations, for hand delivery to the headquarters office. Also, on Friday, November 4, Brousseau placed a copy of the letter and of the text of the petition in a sealed envelope which he delivered "to Vanderburgh's office."

Brousseau's transmittal of the letter *directly* to headquarters was the catalyst for the insubordination charge. Prior to the transmittal of the letter, Vanderburgh asked Brousseau to send the letter to headquarters through Vanderburgh, to which request Brousseau agreed. Brousseau chose later to bypass Vanderburgh and to send the letter directly.

*nization plan has undermined my authority as Regional Director.* Some time during the 10 days preceding November 4, 1977, you and others in your Division, using CSA resources, prepared and circulated a petition protesting a feature of my reorganization plan, urging employees of Region VIII to sign the petition. * * * You, as a management official, ignored your right and obligation to voice opposition to a proposed action directly to your superior, and instead, encouraged other employees to effect something by weight of numbers that you would not or could not achieve by force of argument and appeal to the mission and functions of the Regional Office. [Emphasis in original.]

The assistant director of CSA sustained this charge unqualifiedly in a letter to Brousseau dated Washington, D.C., May 16, 1978. However, taking into account Brousseau's "previous satisfactory employment record, as established in this case," the deciding official, rather than separating Brousseau from the federal service, demoted him from his then "current position as Chief, Management and Budget Division, GS–301–15/5, $40,995/annum * * *, to the position of Senior Community Resource Specialist, GS–301–13/10, $33,825/annum * * *, Community Development Division, Region VIII." The effective date of the demotion was May 18, 1978.

Plaintiff appealed the decision of May 16, 1978, to the FEAA. Before the FEAA, he elected to proceed without an evidentiary hearing and without submitting evidence supplemental to that considered by the CSA. In the prosecution of his case before both the CSA and the FEAA he was represented by competent legal counsel.

On September 25, 1978, the FEAA upheld Brousseau's demotion. With regard to the *charge of conflict of position or interest,* it found that the two specifications thereunder were sustained and were supportive of the charge. More particularly, with regard to specification "a" of the charge, the FEAA found:

Appellant's responses to the notice letter and representations on appeal acknowledge that the events described in specification "a" occurred as described therein. It is established by the evidence that appellant was a member of Region VIII management; there was a reorganization in progress which was initiated at the national headquarters level; the Region VIII proposed reorganization plan contained a "detail" provision to which appellant took exception which provoked his motion at the union meeting to reject the entire proposal; and the copy of the union meeting minutes show that it was unanimously approved by the members present. Therefore, we find these elements of the specification sustained. The record does not reflect that active negotiations were taking place between the agency and Local 3150. However, inasmuch as the Local called a meeting to discuss the proposed reorganization, and adopted a stance on the matter at that time, it is evident that the union was concerned and negotiations between it and management would occur. It is also evident that appellant's actions in making the motion, which was adopted, did influence the management/union relationship on the matter and that his actions were inconsistent with the official position taken by the agency at that time. Accordingly, we also find these elements of the specification sustained.

The first sentence of the specification constitutes the statement of alleged wrongdoing by appellant—"unauthorized dealings with the union ... have substantially undermined labor-management relations in the regional office ..." It is apparent that appellant did not have the authorization of his supervisor, the Regional Director, to make such a motion at a meeting of Local 3150, AFGE, since it was contrary to his own announced position. It follows that, as a member of management, the appellant did involve himself in "unauthorized dealings with the union." It is evident, therefore, that appellant's unanimously-approved motion did have the effect of undermining the

Regional Director's efforts in accomplishing the reorganization because he marshalled the employees present at that union meeting against the RD's efforts. Accordingly, we find this element of Specification "a" sustained and the entire paragraph supportive of Reason 1.

In addition, the FEAA concurred in the statement in specification "a" that Brousseau's activities at the November 4, 1977, meeting of local 3150 "expose[d the CSA] to an Unfair Labor Practice charge under Executive Order 11491, as amended February 6, 1975." In the FEAA's view, Brousseau's "actions at the union meeting specifically violated the intent of [section 1(b)] of" Exec. Order No. 11491 and "[i]t follows that his actions did expose management to an unfair labor practice charge, whether or not any union member present took exception to [Brousseau's] actions."

With regard to specification "b" of the charge of conflict of position or interest, the FEAA concluded:

> * * * It was within the Regional Director's authority and responsibility to prepare a reorganization plan for Region VIII, subject to approval by national headquarters, CSA. When appellant attempted to align the employees of the Regional Office against the plan, he was attempting to defeat the efforts of his own supervisor. In our view, this equates to the language applied in the first sentence of the specification—". . . has undermined my authority as Regional Director." * * *

On February 1, 1979, Brousseau filed a petition in this court. In his petition, he requests that we overturn the FEAA decision and that we grant to him the following relief: "compensatory damages"; reasona-

ble attorney's fees;[9] reinstatement to the "position from which he was ousted or one comparable thereto in rank, pay, status and responsibility"; and an order directing the Government "to correct all necessary employment records and to delete any reference to the adverse action."

## II.

It is long settled that "in considering these adverse personnel actions our review is limited to ascertaining that the final administrative appellate decision was in conformance with the Constitution, statutes, and regulations, was not arbitrary or capricious or taken in bad faith, and was supported by substantial evidence. [Citations omitted.]"[10] Good faith of those taking administrative action is presumed.[11]

■ A. Plaintiff argues that the FEAA decision is not supported by substantial evidence. First, he complains that he has had no evidentiary hearing. He was entitled to and could have had such a hearing before the FEAA. He *chose* there not to have a hearing.[12] It is settled that the administrative procedure by which plaintiff's demotion was effected comports with procedural due process.[13]

■ Second, plaintiff complains that the written statements by Vanderburgh which the CSA considered in deciding to demote plaintiff were not sworn. The written statements in question were the notice of proposed adverse action which Vanderburgh issued to plaintiff and Vanderburgh's reply to plaintiff's answer to this notice.

It is settled that strict rules of evidence do not apply to administrative proceedings.[14] Neither of the written statements

---

9. In his cross-motion for summary judgment, plaintiff does not argue that he is entitled to attorney's fees. Hence, we regard the request for such in his petition as abandoned. Even if not abandoned, we would be unable to grant the request. See 28 U.S.C. § 2412 (1976).

10. *Giles v. United States*, 213 Ct.Cl. 602, 605, 553 F.2d 647, 649 (1977).

11. *Wathen v. United States*, 208 Ct.Cl. 342, 527 F.2d 1191 (1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

12. In making this choice, he was assisted by legal counsel.

13. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

14. *See Grover v. United States*, 200 Ct.Cl. 337 (1973).

in question was required to be sworn.[15] Moreover, plaintiff's concern in this regard is largely of his own making. He chose to waive an evidentiary hearing before the FEAA. By making this choice, he relinquished an opportunity to obtain sworn testimony of Vanderburgh.

Third, plaintiff asserts that the minutes of the November 4, 1977, meeting of local 3150 are not "competent evidence that [p]laintiff * * * was guilty of a conflict of interest." Plaintiff characterizes these minutes as "rank hearsay." This court has held, however, that "hearsay can be substantial evidence to support an administrative adjudication." [16]

It is undisputed that the minutes of the November 4 meeting were prepared by a person who was present at the meeting, namely, Michael McClellan, the then secretary pro temp of local 3150. Before the CSA and the FEAA, plaintiff did not challenge the accuracy of these minutes in any respect. He did not, for example, deny that he had moved at the November 4 meeting that the Gabusi management proposal be rejected "in its entirety [sic] due to the 'detail' provisions." Before this court, however, while admitting his presence at and participation in the November 4 meeting, plaintiff denies that he made any motion at the meeting. He has submitted to the court several affidavits, including his own affidavit dated December 13, 1979, which support this denial. As additional support for the denial, he emphasizes that the minutes of the November 4 meeting have never been "certified" by local 3150.

■ The affidavits before us which support plaintiff's contention that he did not make any motion at the November 4 meeting are, as defendant points out, "by the same individuals who submitted affidavits during the administrative proceedings, which earlier affidavits made no mention of the alleged inaccuracy of the union minutes." Of particular interest are the two affidavits of Mr. McClellan. In his affidavit dated December 12, 1979 (which affidavit postdates the administrative proceedings), he states that sometime *prior to mid-January 1978* he realized that the minutes of the November 4 meeting were "incorrect since Brousseau had not made the motion" regarding the Gabusi management proposal. Yet in his affidavit dated January 31, 1978 (which was submitted to the CSA and the FEAA), McClellan does not indicate that Brousseau did not make the motion.

The court has consistently refused to consider evidence produced for the first time in court proceedings where such evidence was available during administrative review.[17] The affidavits which support plaintiff's contention that he did not make any motion at the November 4 meeting are evidence of the kind just described. Hence, we *refuse* to consider these affidavits.

* * * While plaintiff is correct concerning the standard of *de novo* review followed by this court, we have steadfastly refused to consider evidence which may have been withheld by plaintiff at lower levels of the process in hopes of overwhelming the defendant with new evidence here. *See, e. g., Cohen v. United States*, 212 Ct.Cl. 568 (1977). Plaintiff has made no showing that his newly submitted evidence was in any way newly discovered or unavailable to him at the time of his administrative appeals.[18]

In short, plaintiff's failure to raise before the CSA and the FEAA his contention that he did not make any motion at the November 4 meeting and his failure to adduce the affidavits supporting this contention during the administrative proceedings constitute a

---

**15.** See chapter 752 of the Federal Personnel Manual.

**16.** *Wathen v. United States, supra* note 11, 208 Ct.Cl. at 355, 527 F.2d at 1199, *rehearing denied*, 208 Ct.Cl. 368, 527 F.2d 1207 (1976). In *Wathen*, the court held that newspaper accounts of and an investigative report concerning a homicide were substantial evidence of an administrative finding that the homicide had been committed by the *Wathen* plaintiff.

**17.** *Leefer v. United States*, 215 Ct.Cl. 1061 (1978).

**18.** *Id.* at 1062.

failure to exhaust administrative remedies.[19]

■ Plaintiff's contention that the minutes of the November 4 meeting are incompetent as evidence because they have never been "certified" by local 3150, is similarly belated. He did not advance this contention before the CSA or the FEAA. Hence, we are not required to consider it here. Even if we were to consider the contention, however, we would reject it. For it is as possible that the failure of the union to certify the minutes stemmed from a desire by the union to protect Mr. Brousseau, as it is possible that the failure stemmed from the alleged inaccuracy of the minutes.

We believe, in short, that the minutes of the November 4 meeting provided the FEAA with a rational basis for its finding that at that meeting plaintiff made a motion that the Gabusi management proposal be rejected.[20] We hold that the minutes constitute substantial evidence supportive of this administrative finding.

■ Fourth, plaintiff asserts that the administrative record is devoid of evidence that his demotion promoted the "efficiency of the service."

Once the agency [here the CSA] has made a determination that the employee misconduct has, in fact, occurred, it must make a second determination. This second determination, required by 5 U.S.C. § 7501(a) [current version at 5 U.S.C. § 7513(a) (Supp. III 1979)], must be to the effect that the disciplinary action taken against the employee will "promote the efficiency of the service," [footnote omitted] * * *. The agency may base this determination also on evidence adduced at the employee's hearing which tends to connect the employee's misconduct with the efficiency of the service; or, in certain egregious circumstances, where the adverse effect of retention on the efficiency of the service

could, in light of the nature of the misconduct, reasonably be deemed substantial, and where the employee can introduce no evidence showing an absence of effect on the efficiency of the service, the nature of the misconduct may "speak for itself." * * *[21]

In his capacity as chief of M&B of the CSA region VIII office, plaintiff was a member of CSA management. He exercised direct supervision of five CSA employees and was a member of the senior staff of the region VIII office. As chief of M&B he was charged with the responsibilities of implementing management policies and supporting management positions at the divisional level. Vis-a-vis the general (that is, nonmanagerial) staff of the region VIII office, he was obligated to support or at least not to oppose management proposals, whether they emanated from the regional director or from headquarters.

By circulating among the general staff of the region VIII office the petition calling for the preservation of the management and budget division and by making at the November 4 meeting of local 3150 a motion that the Gabusi management proposal be rejected, plaintiff openly encouraged and indeed invited the general staff of the region VIII office to oppose the reorganization plans propounded by Regional Director Vanderburgh and headquarters. These actions by plaintiff were totally inconsistent with his position as a member of CSA management. We do not think that it can be gainsaid that the actions impaired substantially plaintiff's credibility as a member of CSA management and his ability to function as such. Moreover, we do not think it can be denied that the actions eroded substantially any confidence and trust which CSA management, particularly Vanderburgh, reposed in plaintiff. Finally, we do not think it can be denied that the actions hampered the efforts of CSA management

19. *See Grover v. United States, supra* note 14.

20. *See generally Masino v. United States,* 218 Ct.Cl. 531, 589 F.2d 1048 (1978); *Young v. Hampton,* 568 F.2d 1253 (7th Cir. 1977).

21. *Young v. Hampton, supra* note 20, 568 F.2d at 1257. This language is quoted with approval in *Masino v. United States, supra* note 20, 218 Ct.Cl. at 544, 589 F.2d at 1055.

to achieve a reorganization plan for the region VIII office.

We hold, in short, that plaintiff's misconduct "speaks for itself" in terms of revealing how his demotion promoted the efficiency of the service. His misconduct jeopardized the integrity and efficiency of CSA management. It is clear, for example, that the misconduct strained the working relationship between Vanderburgh and plaintiff. To preserve the integrity and efficiency of its management, the CSA demoted plaintiff. His demotion was from a managerial position to a nonmanagerial position. In the latter position, he is not required to represent or speak for CSA management and he is not required to work as closely with Vanderburgh and most other management officials. In sum, the CSA had a rational basis for its determination that plaintiff's demotion would promote the efficiency of the service.

B. Conceding *arguendo* the validity of the administrative finding that he moved at the November 4 meeting of local 3150 that the Gabusi management proposal be rejected, plaintiff argues that Exec. Order No. 11491 entitled him to make this motion. Specifically, he argues that section 1(a) of Order 11491 granted to him the right to make the motion. Section 1(a) reads in pertinent part:

> * * * Each employee of the executive branch of the Federal Government has the right, freely and without fear of penalty or reprisal, to form, join, and assist a labor organization or to refrain from any such activity, and each employee shall be protected in the exercise of this right. * *

Defendant counters plaintiff's argument by pointing to section 1(b) of Order 11491. Section 1(b) provides in pertinent part:

> (b) Paragraph (a) of this section does not authorize participation in the management of a labor organization or acting as a representative of such an organization by a supervisor, * * * or by an em-

ployee when the participation or activity would result in a conflict or apparent conflict of interest or otherwise be incompatible with law or with the official duties of the employee.

Defendant appears to argue that plaintiff "violated" this subsection when he made the motion relating to the Gabusi management proposal. Additionally, defendant argues that plaintiff's making the motion exposed the CSA to an unfair labor practice charge under section 19(a) of Order 11491. Section 19(a) reads in relevant part:

> Sec. 19. Unfair labor practices. (a) Agency management shall not—
>
> (1) interfere with, restrain, or coerce an employee in the exercise of the rights assured by this Order;
>
> *       *       *       *       *       *
>
> (3) sponsor, control, or otherwise assist a labor organization, * * *;

The FEAA took the position which defendant urges before us. Specifically, the FEAA concluded that plaintiff did "violate" section 1(b) of Order 11491 by making the motion in question and that his making the motion did expose the CSA to an unfair labor practice charge. In reaching the latter conclusion, the FEAA reasoned:

> * * * It goes without saying that union members confronted with a motion made by a member of management may not feel at liberty to question or otherwise speak out against such motion, particularly if that official is one of their own supervisors. * * *

We agree with this reasoning and, therefore, with the FEAA's conclusion that, by making the motion relating to the Gabusi management proposal, plaintiff exposed the CSA to an unfair labor practice charge.[22] We emphasize, however, that we are not holding that by making this motion plaintiff engaged in an unfair labor practice. We are holding merely (i) that the CSA had a rational basis for believing that the act in question might constitute an unfair labor

22. See generally *Department of the Navy v. Boilermakers, Local 290*, A/SLMR No. 393 (1974).

practice and (ii) that the act exposed the CSA to an unfair labor practice charge.

■ We reject plaintiff's contention that section 1(a) of Order 11491 entitled him to make the motion relating to the Gabusi management proposal. The right to "join, and assist a labor organization" which is granted in section 1(a) is limited by section 1(b) of the order. Section 1(b) states that section 1(a) does not authorize a "supervisor" to participate in the "management of a labor organization." At the time he made the motion in question, plaintiff was a CSA "supervisor." [23] In our view, his motion that local 3150 adopt, for purposes of labor-management negotiations concerning the proposed reorganization of CSA regional offices, a position not only in conflict with but in opposition to the Gabusi management proposal, was participation in the "management of" local 3150. Hence, we hold that his making the motion was not authorized by section 1(a) of Order 11491.[24]

■ C. Plaintiff argues that the decision of the CSA to demote him is arbitrary and capricious. Plaintiff adduced, in the administrative proceedings, evidence tending to show that (i) at the time of the November 4, 1977, meeting of local 3150, the membership of the local included, in addition to plaintiff, other management employees in the CSA region VIII office, (ii) these other management employees had attended meetings of local 3150, and (iii) these other management employees were not disciplined or otherwise penalized by the CSA for their involvement with local 3150. Additionally, before us, plaintiff emphasizes that, although he was not the only management employee to *sign* the petition which he prepared and circulated on November 3, 1977, the CSA has taken disciplinary action in connection with the petition only against him.

In rejecting plaintiff's contention that the CSA acted arbitrarily and capriciously in demoting him, the FEAA stated:

Appellant noted that other members of the Region VIII managerial staff, including the Regional Director himself, were dues paying members of the AFGE Local and he contended that they had engaged in business activities of the union with impunity. The record contains a list of union members which confirms appellant's claim that the RD and other supervisors were union members. Affidavits of record reflect that they had attended meetings. Whether or not the membership of these managers in the Local was proper or whether or not they engaged in union business per se, we find no evidence to suggest that any other management employee had sought and obtained unanimous opposition to one of the Regional Director's proposals which then became the union's stance on the matter. In our view, this argument by appellant fails to justify his particular actions at the union meeting in question or show that others engaged in similar or identical activity without suffering disciplinary action.

Having examined the record before us, we concur in this conclusion of the FEAA. Specifically, we find no evidence of record that any other management employee in the region VIII office ever made, at a meeting of local 3150, a motion that a proposal of the region VIII director be rejected. Moreover, we find no evidence of record that any management employee in any other CSA regional office ever made a similar motion. Finally, we find no evidence of record that any other CSA management employee ever *prepared and circulated among CSA general staff employees* a petition similar to the one prepared and circulated by plaintiff.

On the basis of the foregoing evaluation of the evidence of record, we hold that the

---

**23.** His position as chief of M&B of region VIII qualified him as a "supervisor" as this term is defined in section 2(c) of the order.

**24.** We emphasize that we are not holding that it was at the time improper for plaintiff to be a

member of local 3150. We are holding merely that it was improper for him to participate in the management of local 3150 by making the motion in question.

decision of the CSA to demote plaintiff is neither arbitrary nor capricious.

■ D. Plaintiff asserts that "[his] demotion constitutes a reprisal for the exercise of constitutional rights." More specifically, he asserts that his demotion violates his first amendment rights of free speech, association, and petition. As we explain hereinafter, we believe that plaintiff's arguments based on the first amendment are without merit insofar as the CSA's sustaining the charge of conflict of interest or position is concerned. Because of this belief on our part and because we are satisfied that the CSA would have demoted plaintiff had the charge of conflict of interest or position been the only one made and sustained, we hold that plaintiff's demotion does not contravene any of his rights under the first amendment.[25]

The constitutional issue which we decide is whether plaintiff was entitled, by virtue of the first amendment, to make the motion regarding the Gabusi management proposal and to prepare and circulate the petition opposing elimination of the management and budget division.

Government employees do, to some extent, have "lesser rights" than others have under the Constitution, since they may be required to suspend or refrain from certain activities * * * that are embraced within the constitutional rights of others, when such activities are reasonably deemed inconsistent with their public status and duties. *See United Public Workers, etc. v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). * * *[26]

For example,

* * * when * * * uninhibited public speech by Government employees produces intolerable disharmony, inefficiency, dissension and even chaos, it may be subject to reasonable limitations at least

concerning matters relating to the duties, discretion, and judgment entrusted to the employee involved. [Footnote omitted.] * * *[27]

In short, to ensure a basic efficiency in public service, the Government may impose reasonable limitations on activities of its employees which would otherwise be entitled to first amendment protection.

Plaintiff does not dispute that the Government possesses such regulatory power. He alleges, however, that he had no advance notice that his two activities in question here were improper and could lead to disciplinary action against him. His allegation stems from the fact that, so far as the administrative record and the submissions of the parties—and we might add, our research—reveal, no Government statute, regulation, or policy *specifically* proscribed plaintiff's two activities as of or prior to the time plaintiff engaged in them. On the basis of this apparent absence of a specific prior proscription of the two activities, plaintiff argues that his demotion operates to chill exercise by him (and, presumably, by others similarly situated) of rights accorded by the first amendment.

Plaintiff's "chilling effect" argument is without merit. Plaintiff was demoted pursuant to the provisions of the Lloyd-La Follette Act, as then codified, 5 U.S.C. § 7501 (1976) (current version at 5 U.S.C. §§ 7503 and 7513 (Supp. III 1979)). Section 7501(a) provided:

(a) An individual in the competitive service may be removed or suspended without pay only for such cause as will promote the efficiency of the service.

In *Arnett*, the Supreme Court declared that this removal standard of "such cause as will promote the efficiency of the service" is "intended to authorize dismissal for speech as well as other conduct."[28] The plaintiffs

---

25. *See generally Mt. Healthy School Dist. City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

26. *Meehan v. Macy,* 392 F.2d 822, 832 (D.C. Cir.), *modified,* 425 F.2d 469 (1968), *aff'd en banc,* 425 F.2d 472 (1969).

27. 392 F.2d at 833.

28. *Arnett v. Kennedy, supra* note 13, 416 U.S. at 160, 94 S.Ct. at 1647. The original plaintiff in *Arnett* was a former federal employee who had been removed from the federal service because he had stated publicly, "without any proof whatsoever and in reckless disregard of

in *Arnett* had argued that the removal standard was unconstitutionally vague and overbroad and violative of their first amendment rights. More specifically, they had alleged that "§ 7501(a) and related regulations are unconstitutional on their face inasmuch as they chill the First Amendment rights of freedom of speech of [federal] employees due to their vagueness and overbreadth."[29]

Rejecting the plaintiffs' constitutional arguments, the Supreme Court held that "the standard of employment protection imposed by Congress in the Lloyd-La Follette Act, is not impermissibly vague or overbroad in its regulation of the speech of federal employees and therefore unconstitutional on its face."[30] The Court justified this holding partly as follows:[31]

> Because of the infinite variety of factual situations in which public statements by Government employees might reasonably justify dismissal for "cause," we conclude that the Act describes as explicitly as is required, the employee conduct which is ground for removal. The essential fairness of this broad and general removal standard, and the impracticability of greater specificity, were recognized by Judge Leventhal, writing for a panel of the United States Court of Appeals for the District of Columbia Circuit in *Meehan v. Macy*, 129 U.S.App.D.C. 217, 230, 392 F.2d 822, 835 (1968), modified, 138 U.S.App.D.C. 38, 425 F.2d 469, aff'd en banc, 138 U.S.App.D.C. 41, 425 F.2d 472 (1969):
>
> > "[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of em-

ployees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' We think it is inherent in the employment relationship as a matter of common sense if not [of] common law that [a Government] employee . . . cannot reasonably assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [cartoons]. . . . [Dismissal in such circumstances neither] comes as an unfair surprise [nor] is so unexpected as to chill . . . freedom to engage in appropriate speech."

█ The instant plaintiff's common sense should have forewarned him that his two activities in question here were improper and could lead to his demotion. The position of chief of M&B of the CSA region VIII office conferred management employee status on its holder. Inherent in the occupancy of this position was an obligation not to invite or encourage opposition by nonmanagerial employees to plans or proposals advanced by CSA management, especially superior management. By making the motion that the Gabusi management proposal be rejected and by preparing and circulating the petition opposing elimination of the management and budget division, Brousseau thrust himself into a clear conflict of position. He flouted, not once but twice, the elemental duty of loyalty which he, as a management employee, owed to his immediate superior and to other management officials.[32] We do not hesitate to find that Brousseau's awareness that he was chief of M&B necessarily entailed an awareness on his part of the just stated duty of loyalty.[33] Hence, we conclude that

---

the actual facts," that his superior had engaged in attempted bribery.

**29.** *Kennedy v. Sanchez*, 349 F.Supp. 863, 866 (N.D.Ill.1972), *rev'd sub nom. Arnett v. Kennedy, supra* note 13.

**30.** *Arnett v. Kennedy, supra* note 13, 416 U.S. at 164, 94 S.Ct. at 1649. This holding, stated in the plurality opinion of Justice Rehnquist, was joined in by five other justices.

**31.** *Id.* at 161–62, 94 S.Ct. at 1647–48.

**32.** *See generally Harrington v. United States*, 161 Ct.Cl. 432, 444 (1963); *Meehan v. Macy, supra* note 26, 392 F.2d at 833–34.

**33.** Brousseau's awareness of the duties of his position was not his only source of advance notice that making the motion regarding the Gabusi management proposal would be improper. Prior to the November 4, 1977, meet-

his demotion was not so unexpected as to chill exercise of first amendment rights.

Having rejected plaintiff's "chilling effect" argument, we turn to the question whether his making the motion regarding the Gabusi management proposal and his preparing and circulating the petition opposing elimination of the management and budget division were protected conduct under the first amendment. For the reasons stated below, we hold that neither activity is entitled to first amendment protection.

If a Government employee engages in one or more activities involving speech, association, or petition for redress of grievances and if these activities give rise to a diminution in the efficiency of the federal service, competing interests must be balanced to determine whether the activities are protected under the first amendment.[34] Specifically, the interests of the employee, as a citizen, in engaging in the activities must be weighed against the interest of the Government, as an employer, "in promoting the efficiency of the public services it performs through its employees."[35] The necessity for striking this balance is explained eloquently in *Meehan*:[36]

> Courts are increasingly re-examining and considering the issue whether and to what extent the Government's prerogative to employ or discharge permits it to regulate conduct of its employees that would, in the absence of the employment relationship, be protected from interference by the First Amendment. [Footnote omitted.] As Government services multiply, the liberties of Government employees come to be the liberties of an increasing and substantial portion of the citizenry, and are accordingly given increased recognition. [Footnote omitted.] There is a reverse side to the coin: With mounting provision of increased and increasingly indispensable services rendered by Government employees, the public weal demands administration that is effective and disciplined, and not beset by turmoil and anarchy.

In striking the appropriate balance in the instant case, we focus first on plaintiff's circulating among most of the employees of the region VIII office the petition opposing elimination of the management and budget division. At the time he prepared and circulated the petition, plaintiff was required by his position as chief of M&B to work closely with Regional Director Vanderburgh. Vanderburgh was plaintiff's immediate superior and plaintiff was Vanderburgh's representative or agent at the management and budget divisional level. One prerequisite to a successful working relationship between the two men was that each be trustful of and feel confident about the other. Another prerequisite to a successful working relationship between them was that plaintiff be willing to support and implement Vanderburgh's proposals at the divisional level.

One of Vanderburgh's proposals was that the management and budget division be eliminated. By preparing and circulating the petition opposing this proposal, plaintiff violated the duty of loyalty which he owed to Vanderburgh. By violating this duty of loyalty, plaintiff eviscerated any trust or confidence which Vanderburgh had in him. The loss of such trust or confidence made a close working relationship between the two men impossible.

A close working relationship between the person holding the position of regional director and the person holding the position of chief of M&B was vital, however, to the efficient operation of the region VIII office. Hence, the CSA had a compelling reason for removing plaintiff from the latter position. By demoting him to a nonmanagerial position, the CSA eliminated the requirement

---

ing of local 3150, Brousseau was informed at a region VIII senior staff meeting that participation by management employees in meetings of local 3150 was "dangerous."

**34.** *See Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**35.** *Id.* at 568, 88 S.Ct. at 1734.

**36.** *Meehan v. Macy, supra* note 26, 392 F.2d at 832.

for Vanderburgh and plaintiff to engage in a close working relationship.[37]

Moreover, plaintiff's demotion was justified because it served to maintain discipline among and preserve the solidarity of CSA management employees. By circulating the petition, plaintiff was encouraging nonmanagerial employees to oppose a proposal advanced by a member of CSA management. Such encouragement was improper. Management cannot function effectively unless it operates "with one voice" *vis-a-vis others*. Cohesive operation of management is dependent on the loyalty of inferior management to superior management. This loyalty must be maintained in situations involving management's relations with nonmanagerial employees. For management to countenance disloyalty in such situations would be for management to render itself impotent.

Our holding in *Swaaley*[38] does not require us to conclude that plaintiff's circulating his petition among most of the employees of the region VIII office is protected conduct under the first amendment. The plaintiff in *Swaaley* was not a management employee. Moreover, he did not circulate his grievance letter among his fellow workers and thereby instill discord in them. He mailed his letter, signed only by him, to a single person, the then Secretary of the Navy. "[S]o far as the record show[ed, he did not] mail or otherwise publish it to anyone else."[39]

The instant plaintiff, however, circulated his petition among most of the employees of the region VIII office. Many of these employees signed the petition. Of the employees signing the petition, many were nonmanagerial employees. Hence, by circulating the petition, plaintiff, a management employee, encouraged opposition by nonmanagerial employees to a management proposal. The sum effect of these factual distinctions between *Swaaley* and the instant case is that the holding in *Swaaley* does not cover the conduct in question here. *Swaaley* is, in short, inapplicable here.

We turn now to plaintiff's making the motion that the Gabusi management proposal be rejected. Plaintiff made the motion at the November 4, 1977, meeting of local 3150. Present at that meeting were several nonmanagerial employees of the region VIII office.

The Gabusi management proposal was formulated and advanced by CSA management officials in the headquarters office. By making the motion in question, plaintiff, a management employee, actively invited and encouraged nonmanagerial employees to oppose the proposal. For all the reasons discussed heretofore, such disloyalty on the part of a management employee was improper and substantially detrimental to the efficiency of CSA management.

---

**37.** The facts underlying this case are different from the facts in *Pickering v. Board of Educ.*, *supra* note 34. There a local board of education dismissed a teacher he had written and published in a newspaper a letter criticizing (i) the board's allocation of school funds between educational and athletic programs and (ii) the board's and superintendent's methods of informing, or preventing the informing of, the school district's taxpayers of the real reasons why additional tax revenues were being sought for the schools. In reaching its holding that the teacher's dismissal violated his rights to freedom of speech, the Supreme Court noted that the "statements [in the teacher's letter which were found objectionable by the board of education were] in no way directed towards any person with whom [the teacher] would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented

here. [The teacher's] employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Id.*, 391 U.S. at 569–70, 88 S.Ct. at 1735.

**38.** We held there that "a petition by a federal employee to one above him in the executive hierarchy is covered by the First Amendment and if it includes defamation of any Federal official, protection is lost only under the circumstances in which a newspaper article would lose such protection if it defamed such official." *Swaaley v. United States, supra* note 4, 180 Ct.Cl. at 12, 376 F.2d at 863.

**39.** *Id.*, 180 Ct.Cl. at 3, 376 F.2d at 858.

We conclude, on the basis of the foregoing considerations, that the interests of plaintiff, as a citizen, in engaging in the two activities in question were substantially outweighed by the interest of the Government in promoting the efficiency of the federal service. Therefore, we hold that neither of the two activities is entitled to first amendment protection.[40]

### CONCLUSION

The FEAA decision sustaining plaintiff's demotion is affirmed as indicated. Defendant's motion for summary judgment is granted. Plaintiff's cross-motion is denied. The petition is dismissed.

---

**40.** Our holding is limited, of course, to the particular facts of this case. There can be no doubt that "[p]ublic employees have First Amendment rights which may not be curtailed arbitrarily or by vague and ill defined rules." *Swaaley v. United States, supra* note 4, 180 Ct.Cl. at 11, 376 F.2d at 863.