Harold BROWN, Petitioner,

v.

**DEPARTMENT OF TRANSPORTATION, FEDERAL AVIATION ADMINISTRATION, Respondent.**

**Appeal No. 83–1254.**

United States Court of Appeals, Federal Circuit.

May 18, 1984.

Richard Emery, New York City, argued for petitioner. With him on the brief was Arthur Eisenberg, New York City.

David M. Cohen, Washington, D.C., argued for respondent. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., Sandra P. Spooner, Asst. Director, and Robert A. Reutershan, Washington, D.C., Diane R. Liff, Asst. Gen. Counsel for Litigation, Dept. of Transp., Washington, D.C., of counsel.

Before FRIEDMAN, RICH and SMITH, Circuit Judges.

EDWARD S. SMITH, Circuit Judge.

Petitioner Harold Brown (Brown) appeals from a decision of the Merit Systems Protection Board (board), affirming the decision of the Department of Transportation's Federal Aviation Administration (agency) to remove Brown from his position as a supervisory air traffic control specialist at the New York Air Traffic Control Center (TRACON), on the basis of a misconduct charge arising from comments, broadcast by the national media, which Brown made to striking air controllers. We affirm in part, reverse in part, and remand.

*Background*

Brown had been an agency employee for nearly 25 years when he was removed, effective September 5, 1981. For the last 2 years of his employment Brown was one of some 21 first-line team supervisors at TRACON, each of whom supervised approximately nine air traffic controllers. During the period here at issue, Brown was not a member of the Professional Air Traffic Controllers' Organization (PATCO), the air controllers' labor union. At no time did Brown participate in the nationwide air con-

trollers' strike which PATCO called on August 3, 1981, and which at TRACON was nearly wholly effective. In fact, Brown worked a 12-hour shift the first day of the strike, from 7 or 8 p.m. on August 3 to 7 or 8 a.m. the morning of August 4.

On the evening of August 4, 1981, during his off-duty hours, Brown went to the local union hall in Mineola, New York, to advise his controllers that he was indeed still working.[1] He testified that he found himself at the podium where he first stated: "I wish you'd all come back, 'cause I'm too tired and too old to be working these long hours." He then stated: "I'm so happy that you're together. Stay together, please, because if you do, you'll win." After he left the podium, Brown testified that he spoke to a television reporter and stated that the strike was "illegal," but also said that "I support some of the strike demands." Brown left the PATCO meeting shortly thereafter, having attended it, according to his testimony, no longer than a half hour to an hour.

The atmosphere in which Brown spoke was highly charged. National television cameras and reporters were present at the union hall. Although Brown's remarks while he was on the podium, with a microphone thrust in his hand, were brief, the portion of those remarks quoted above and concerning "stay together" were picked up by the media and broadcast nationwide that evening. Brown's supervisor was watching that particular television program; 24 hours later Brown received a letter from that supervisor proposing Brown's removal. The charge, misconduct, was stated as follows:[2]

*Reason 2:* Misconduct

*Specification:* Your appearance in Mineola, New York, on August 4, 1981,

before a cluster group of striking controllers was reported by Richard Anderson of ABC News on the ABC News Program, "Nightline," a nationwide Network TV Broadcast beginning at 11:30 P.M. EDT on August 4, 1981. The reporter identified you as an FAA supervisor. The statements you made to the controllers contradicted the public orders by the President for striking controllers to return to duty, as well as the telegraphic message of August 3, 1981, (copy of text enclosed), directing striking controllers to report for duty.

Brown again appeared on the ABC news program, "Nightline," the evening of August 6, 1981, following his receipt August 5 of the notice of his proposed removal. The reporter interviewed Brown briefly and ran again the video clip of Brown's "stay together" remarks from two evenings before, as a follow-up to that story.

Brown appealed his removal to the board which, in an initial decision dated August 23, 1982, ordered the agency to cancel its removal action and restore Brown to his former position.[3] The presiding official based this decision on the first amendment protection provided Brown's speech, as that of a Government employee, in that context. The full board reversed (one member dissenting) and sustained the removal on the ground that Brown's remarks were not constitutionally protected.[4] Brown appeals to this court.

### Issues

We address first the issue whether Brown's speech was constitutionally protected. Since we find that it was not, we next address the question whether a nexus existed between Brown's off-duty remarks

---

1. As a result of a minor altercation between Brown and a policeman the morning of August 3, concerning Brown's car at the gate of TRACON, a number of Brown's controllers wondered if he had been suspended or removed, and were telephoning him to this effect.

2. That letter also charged as a basis for removal participation in an illegal strike in violation of 5 U.S.C. § 7311 (1982). The agency dropped this

charge, however, before Brown appealed to the board.

3. *Brown v. Federal Aviation Admin.*, MSPB Initial Decision No. NY075281F1457 (Aug. 23, 1982).

4. *Brown v. Federal Aviation Admin.*, MSPB Docket No. NY075281F1457 (May 19, 1983).

as supervisor and the efficiency of the agency's operations. Finding that this nexus existed, we discuss the appropriateness of the penalty imposed and remand for mitigation of that penalty.

## Opinion

### 1. First Amendment Protection

Government employees may exercise their first amendment rights without fear of retaliatory dismissal in certain circumstances. The Supreme Court has stated the test for determining the extent to which the state may regulate the speech of its employees:

> The problem in any case is to arrive at a balance between the interests of the * * [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.[5]

We must therefore apply the *Pickering* test by determining (1) whether Brown's speech addressed a matter of public concern and, if so, (2) whether the interest of the agency in promoting the efficiency of the public service it performs (air traffic control) outweighed Brown's interests as a citizen.[6]

In deciding whether Brown's remarks addressed a matter of public concern, we must look to the "content, form, and context of a given statement, as revealed by the whole record."[7] The board in its opinion below conceded that the national air traffic controllers' strike was a matter of public concern, but found Brown's remarks only tangentially related to such concern. This view is not unreasonable: Brown's primary purpose in going to the union hall

was to reassure his controllers that he had not been fired. However, the atmosphere at that hall at least in part changed the nature of his visit. In attendance there were not only union members and their families but journalists from the print and broadcast media as well. Brown's position as a nonunion supervisor, with 25 years' experience with the agency, added interest and credibility to his remarks. It is not surprising that a national television network found Brown's comments concerning "stay together" and "you'll win" worthy of nationwide broadcast. Moreover, as noted above, Brown's remarks to other journalists, remarks not telecast, included his opinion that the strike was illegal, but that he nonetheless supported some of the strikers' demands. Bound as we are to consider the entire context and record of Brown's remarks, we find persuasive Brown's general contention that his comments extended well beyond the local union hall and his friends, the controllers, to rise to the level of speech on a matter of urgent public concern.

Having determined that Brown's remarks addressed a matter of public concern, we must decide if the interest of the agency as employer in promoting the efficiency of the public service it performs—control of the nation's air transportation system—outweighed Brown's interest in speaking on a public issue without fear of retaliatory dismissal. This involves a delicate balancing process:

> * * * *Pickering* unmistakably states * * that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible bal-

---

**5.** *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1967). *See also Brousseau v. United States*, 640 F.2d 1235, 1248, 226 Ct.Cl. 199 (1981).

**6.** We note at the outset that our standard of review of this first amendment issue involves "an individualized and searching review of the factors asserted by the employer to justify the discharge." *Tygrett v. Barry*, 627 F.2d 1279, 1282–83 (D.C.Cir.1980). Since no facts are dis-

puted in the case before us, we apply our statutorily mandated standard of review of the board's decision—*i.e.*, we shall set aside its conclusions if we find them "not in accordance with law." 5 U.S.C. § 7703(c)(1). *See also Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690 n. 7 and 1692 n. 10, 75 L.Ed.2d 708 (1983).

**7.** *Connick*, 103 S.Ct. at 1690.

ance of the competing interests. [Footnotes omitted.] [8]

Weighing on the agency's side of this balance is the seriousness of the general situation: a nationwide strike, illegal and a criminal offense under federal law, aimed at one of the vital arteries of the nation's transportation system.[9] Certain telling particularized factors also weigh on the Government's side: the critical timing of Brown's remarks, some 36 hours after PATCO called the strike and during the 48-hour grace period in which President Reagan declared that striking controllers could return to work without losing their jobs; Brown's position as a supervisor and employee with long experience, to whom controllers in that highly charged moment could be expected to look for guidance; the fact that Brown's remarks, while not illegal themselves,[10] encouraged the controllers to stay together and attempt to win an illegal strike. Moreover, Brown's position as a supervisor not only to whom nine controllers reported but who reported himself to higher-level agency management, weighs heavily on the agency's side. As was stated by a predecessor court in a first amendment context:

> Management cannot function effectively unless it operates "with one voice" *vis-a-vis others* [emphasis in original]. Cohesive operation of management is dependent on the loyalty of inferior management to superior management. This loyalty must be maintained in situations involving management's relations with nonmanagerial employees. For management to countenance disloyalty in such

situations would be for management to render itself impotent.[11]

Cooperation, loyalty, and trust are particularly important among those managing the operation of a complex, sophisticated transportation system where the lives of hundreds of innocent members of the public may, in extreme cases, depend upon split-second judgment. Such need for trust was even more acute at the moment Brown uttered his remarks, since the strike at TRACON was nearly wholly effective and management itself, working exhausting shifts, was largely operating the system.

Brown contends that the agency must "clearly demonstrate" that his speech "substantially and materially" interfered with the agency's operations, and that the agency failed utterly to carry this burden. Brown cites the testimony of the supervisor who fired him as amounting to little more than "undifferentiated speculation" on the question of harm. Brown correctly points out the inability of the agency to produce testimony of other team leaders or controllers regarding, for example, specific controllers who were dissuaded from returning to work as a result of Brown's remarks. He also notes that his comments were made during his off-duty hours, that no agency instructions barred supervisors from speaking to the press or even associating with strikers, and that in any event his supervisory position was of such a low level, with so many layers of management above him, that he could not have breached any trust.[12]

■ In our view Brown would place too great a burden on the agency to show

**8.**  *Connick,* 103 S.Ct. at 1691–92.

**9.**  *See, e.g., Schapansky v. Department of Transp.,* 735 F.2d 477 (Fed.Cir.), issued this day; *PATCO v. Federal Labor Relations Auth.,* 685 F.2d 547, 622 (D.C.Cir.1982) (concurring opinion of Judge MacKinnon).

**10.**  That part of the statute (5 U.S.C. § 7311(3)) prohibiting federal employees from holding a position in the Government if they assert the right to strike (as opposed to actually participating in a strike) against the Government, has been held unconstitutional. *National Ass'n of*

*Letter Carriers v. Blount,* 305 F.Supp. 546, 550 (D.D.C.1969), *appeal dismissed,* 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970); *United Fed'n of Postal Clerks v. Blount,* 325 F.Supp. 879, 884 (D.D.C.), *aff'd,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971).

**11.**  *Brousseau,* 640 F.2d at 1249. *See also Pickering,* 391 U.S. at 570, 88 S.Ct. at 1735.

**12.**  *See also* note 4, *supra,* dissenting opinion of board member Devaney for thorough discussion of these points.

harm in his case. *Pickering* and *Connick* allow, indeed mandate, that the state's burden may vary depending upon the nature of the employee's expression. It is the duty of the court to perform a "particularized balancing" between the competing interests.[13] The authorities upon which Brown has relied in support of his view of the Government's burden on harm are distinguishable on the facts from this particular, acute situation.[14] While we have found that Brown's expression constituted a matter of public concern, we have also noted its context, especially its timing, and Brown's position itself as a supervisor. We have also discussed the factors weighing for and against the agency's showing of harm. Balancing all of these delicately as we must, we find that the interest of the agency did, in this national emergency context, outweigh Brown's interest in free speech, such that his remarks are not constitutionally protected.

### 2. The Nexus Requirement

■ In imposing disciplinary action against Brown for his conduct, the agency was limited by law to taking action "only for such cause as will promote the efficiency of the service."[15] This "nexus" limitation requires the agency to show by a preponderance of the evidence the necessary connection (*i.e.*, promotion of the efficiency of the service) between the employ-

ee's offending conduct (off-duty in this case) and the employee's job-related responsibilities.[16] Since the nexus analysis is similar if not identical to the *Pickering* balance we have performed above between Brown's conduct as supervisor (off-duty remarks) and the agency's interest in promoting the efficiency of the public service it performs, we do not repeat it here. We find, based on that analysis, that substantial evidence exists on the record for the board's finding that the agency proved the necessary nexus between Brown's conduct and his job responsibilities in a supervisory position. Brown's "common sense should have forewarned him"[17] that appearing before a union hall full of strikers, even though those strikers were his friends, could easily turn into a situation where his loyalty to management could be cast in doubt—as indeed it was.

### 3. Appropriateness of Penalty

■ Having found sufficient evidence on the record to justify the required nexus, we examine the appropriateness of the penalty imposed—removal. In so doing we recognize the considerable discretion which employing agency rightfully must exercise in this area.[18] We also recognized and have weighed the numerous relevant factors to be considered in judging the appropriateness of the penalty.[19] Nevertheless,

**13.** *Connick, supra* note 8.

**14.** *See,* especially, *Tygrett,* 627 F.2d 1279, involving a single, probationary police officer who advocated a "sick-in" or "blue flu," where no actual strike, let alone a strike of nationwide dimension, was in heated process. *See also Monsanto v. Quinn,* 674 F.2d 990, 997 (3d Cir. 1982), finding insufficient evidence of disruption to the operations of the Tax Division to "tilt" the balance against first amendment protection where an internal revenue officer's letters concerned poor management and structure of division; *Kim v. Coppin State College,* 662 F.2d 1055 (4th Cir.1981), remanding to jury for factual determination whether professors' involvement in student boycott actually disrupted school activities. We note also that neither *Pickering* itself, which concerned a school teacher's letter to a newspaper criticizing the board of education's management of *past* revenue-raising proposals, nor any of *Pickering*'s progeny, involve a national emergency such as the air

control strike which we face here. *See, e.g.,* discussion of *Pickering*'s progeny in *Connick, supra* note 6, 103 S.Ct. at 1689.

**15.** 5 U.S.C. § 7513(a).

**16.** *See Hayes v. Department of the Navy,* 727 F.2d 1535, 1539 (Fed.Cir.1984), and cases cited therein. *See also Douglas v. Veterans Admin.,* 5 M.S.P.B. 313, 329 (1981).

**17.** *Brousseau,* 640 F.2d at 1247.

**18.** *Nagel v. Department of Health & Human Serv.,* 707 F.2d 1384 (Fed.Cir.1983); *Schapansky, supra* note 9.

**19.** *See Douglas,* 5 M.S.P.B. at 332 for listing of factors. These factors are, of course, illustrative and for the assistance of agencies in selecting a penalty, rather than for their mechanical application. *Nagel,* 707 F.2d at 1386.

we believe that Brown's case is exceptional. His remarks on the illegality of the strike and his expressed wish that the strikers would "all come back" are at least as strong evidence that his statements supported, rather than, as stated in the specification, that they "contradicted the public orders by the President for striking controllers to return to duty." Brown's 25 years' service, his nonparticipation in the strike, his demonstrated willingness to work 12-hour shifts at a time when the agency desperately needed him, plus the brevity and relative ambiguity of his remarks, combine to make a showing of the reasonableness of Brown's complete removal difficult if not impossible. Perhaps it is not far off the mark to characterize the agency's action, in Brown's isolated case, as one of overreaction. We therefore reverse the board's sustaining of the agency's complete removal penalty and remand for mitigation of that penalty. Having done so, we do not need to address the other procedural and due process issues Brown has here raised.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.